BAGGETT TRANSPORTATION COM-
PANY, Plaintiff,

and

C. I. Whitten Transfer Co., Inc.,
Intervening Plaintiff,

v.

UNITED STATES of America, and In-
terstate Commerce Commission,
Defendants,

and

H. Messick, Inc., Intervening Defendant.
Civ. A. No. 64–33.

United States District Court
N. D. Alabama, S. D.

July 29, 1964.

Harold G. Hernly, Wrape & Hernly, Washington, D. C., and Ormond Somerville, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for plaintiffs.

Macon L. Weaver, U. S. Atty., and E. Ray Acton, Asst. U. S. Atty., Birmingham, Ala., William H. Orrick, Jr., Asst. Atty. Gen., Lionel Kestenbaum and Michael I. Miller, Attys., Dept. of Justice, Washington, D. C., and Robert W. Ginnane, Gen. Counsel, I. C. C., Washington, D. C., for defendants.

White, Dickey & Skelton, Springfield, Mo., Markstein & Cain, Birmingham, Ala., and Frank B. Hand, Jr., Washington, D. C., for intervening defendant, H. Messick, Inc.

Before RIVES, Circuit Judge, and LYNNE and ALLGOOD, District Judges.

LYNNE, District Judge.

Proceeding under 28 U.S.C.A. §§ 1336, 1398, 2284, and 2321 through 2325, plaintiff, Baggett Transportation Company (hereinafter Baggett),[1] brought this ac-

---

1. C. I. Whitten Transfer Co., Inc. (hereinafter Whitten) was permitted to intervene as a party plaintiff.

tion to enjoin, annul, and set aside a report and order of the Interstate Commerce Commission[2] entered July 8, 1963, in its Docket No. MC–623 (Sub.-No. 32), H. Messick, Inc., Extention-Explosives.[3] In its report and order the Commission granted the applicant Messick a permit to operate as a contract carrier by motor vehicle transporting "explosives, blasting agents, blasting materials and supplies; materials used in the manufacture of explosives; empty containers used in the transportation of any of the aforementioned items" under contract with the Hercules Powder Company (hereinafter Hercules) between its plants near Carthage, Mo., McAdory, Ala., and Kenvil, N. J., on the one hand and, on the other, points in numerous states surrounding each plant.

For the purpose of this opinion it is unnecessary to review the proceedings before the Commission antecedent and subsequent to the issuance of its report of July 8, 1963, since it is conceded that plaintiffs have exhausted their administrative remedies.

In addition to other services characterized by the Commission as "distinctive and highly specialized",[4] under its contract with Hercules Messick would allow its trailers to be retained up to fourteen days, without additional charge, for the purpose of storing nitro carbo nitrate (hereinafter NCN).

After reviewing the legislative history of the 1957 amendments, the Supreme Court in I.C.C. v. J-T Transport Co., 368 U.S. 81, 87, 88, 82 S.Ct. 204, 208, 209, 7 L.Ed.2d 147 concluded that their direct effect was to change the result of its decisions in United States v. Contract Steel Carriers, 350 U.S. 409, 76 S.Ct. 461, 100 L.Ed. 482. Thus it held:

"Section 203(a) (15), however, was amended, so far as material here, by adding to the description of the term 'contract carrier by motor vehicle' one who furnishes 'transportation services designed to meet the distinct need of each individual customer.' And § 209(b) was amended by adding a sentence which sets forth five factors the Commission shall consider in determining whether the permit should issue:

"'In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider (1) the number of shippers to be served by the applicant, (2) the nature of the service proposed, (3) the effect which granting the permit would have upon the services of the protesting carriers and (4) the effect which denying the permit would have upon the applicant and/or its shipper and (5) the changing character of that shipper's requirements.' (Numerals added.)"

The precise holding of the Court in J-T Transport is that, in its opinion and order under review, the Commission indulged an impermissible presumption that existing service must be found to be reasonably adequate until proven inadequate by the applicant and its supporting shipper. The Court concluded that the burden of proof was misplaced

---

2. H. Messick, Inc. (hereinafter Messick) was permitted to intervene as a party defendant.

3. The report accompanying the order is published at 92 M.C.C. 293.

4. "Applicant proposes: (1) to assign equipment, which is especially suited to transporting explosives, to the exclusive use of the shipper; (2) to spot equipment at the plants prior to loading; (3) to provide a trailer retention service at jobsite destinations for the storage of nitro carbo nitrate; (4) to provide conveyors for loading and unloading; (5) to conduct two-man operations with experienced drivers familiar with the shipper's magazines who will assist in unloading; (6) to provide 10-wheel trucks for delivery to points inaccessible to tractor-trailer units; (7) to make dropoffs and deliveries at a definite day and hour to jobsite or magazine locations; and (8) to furnish tank vehicles for the transportation of explosive slurry." 92 M.C.C. at page 297.

and that the existing carrier must prove affirmatively the adequacy of its service.[5]

On other occasions this Court has been impressed with the awareness of a heavily burdened Commission that it is a clearly defined national transportation policy [6] which it is engaged in enforcing. In the language of the Court in J-T Transport:

"Had the Commission, having drawn out and crystallized these competing interests, [the situation of protesting carriers and the situation of supporting shippers], attempted to judge them with as much delicacy as the prospective nature of the inquiry permits, we should have been cautious about disturbing its conclusion." [7]

But a careful review of the record in this case has convinced us that the Commission, in discussing the five criteria which the Congress directed it to consider and in its application of them to the facts found by the examiner and adopted by the Commission, erroneously assumed that these criteria might be treated as though they were factors in an algebraic equation which might be solved mechanically.

We recognize that the Commission explicitly stated: "Having evaluated the pertinent evidence of record in the light of the criteria enumerated in section 209(b), we are satisfied that the weighing of all five factors warrants, on balance, a finding that issuance of a permit, authorizing operations to the extent hereinafter indicated, will be consistent with the public interest and the national transportation policy." [8]

But we are persuaded by a careful reading of its opinion and the entire record which it was considering that it attached equal weight to each criterion, thereby employing a standard which, under the circumstances of this case, was not a proper one.[9]

Having arrived at the opinion that these proceedings must be remanded to the Commission for further consideration of the present record, supplemented in any manner which it regards appropriate, we deem it prudent to comment by way of caveats on two issues mightily belabored by all parties in briefs

5. The Court made it plain that the adequacy of existing services is a criterion to be considered by the Commission by stating: " * * * the question of the need of the shipping public for the proposed service necessarily includes the question whether the extent, nature, character, and suitability of existing, available service makes the proposed service out of line with the requirements of the national transportation policy." 368 U.S. at page 88, 82 S.Ct. at page 209.

6. The national transportation policy, as declared in the Act, 49 U.S.C.A. preceding § 301 reads: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act [chapters 1, 8, 12, 13 and 19 of this title], so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

7. 368 U.S. at page 89, 82 S.Ct. at page 209.

8. 92 M.C.C. at page 301.

9. It may fairly be assumed that the case would be rare indeed where the balancing of competing interests of shippers, applicants and existing carriers would admit of the assignment of equal weight to each one of the five criteria.

and oral arguments before us. The first concerns the express finding of the Commission that: "Although trailer retention is a service auxiliary to over-the-road movements, it is clearly a transportation service within the meaning of the Interstate Commerce Act." [10] While we are not disposed at this time to decide that such finding or conclusion either was, or was not supported by substantial evidence in the record, we are constrained to suggest that the Commission should take another look at the facts in the light of National Trailer Convoy, Inc. v. United States, 227 F.Supp. 730 (N.D. Okl.1964). That Court concluded, and we agree, "that before the Commission may give weight to the shippers' distinct needs it must first determine that those needs pertain to a transportation service."

The Court there had before it the report and order of the Commission entered in its Docket No. M.C.–124190, Griffin Mobile Home Transporting Co., Contract Carrier Application,[11] which was urged upon this court in oral arguments in behalf of defendants as supporting their position in this case. While the Commission there did not explicitly find that the services in question, sometimes characterized as "accessorial," "ancillary," "additional," and "personalized", were transportation services within the meaning of the Act, it was apparently more preoccupied with the distinct needs of the shippers, and made no attempt to draw a distinction between their transportation and nontransportation needs.

■ The undisputed fact that Hercules has demonstrated a distinct need for trailer retention up to fourteen days at the jobsite or magazine, without additional charge, for the purpose of stor-ing NCN merely frames the question as to whether such service is tailored to meet its transportation needs, on the one hand, or its sales needs on the other. We agree with the opinion of the Court in National Trailer Convoy, supra, that: "Activities pertaining to sale are beyond the scope of transportation." [12]

Both Baggett and Whitten hold certificates authorizing them to transport "explosives and blasting supplies." They complain that the interpretation placed by the Commission in its conclusion that " * * * nitro carbo nitrate may not be transported under authority to transport blasting supplies and explosives" [13] was capricious or arbitrary, that it constituted an abuse of discretion, or that it did violence to some established principle of law. Twice before we have had occasion to enunciate our understanding of the rule on judicial review of a Commission certificate interpretation. Floyd & Beasley Transfer Co. v. United States, 185 F.Supp. 390 (N.D.Ala.1960), and Malone Freight Lines, Inc. v. United States, 107 F.Supp. 946 (N.D.Ala.1952), aff'd, 344 U.S. 925, 73 S.Ct. 497, 97 L.Ed. 712.[14]

While we are presently unwilling to disagree with the Commission's interpretation of a certificate of its own creation, we note that the record in this area is so confusing that the Commission apparently felt compelled to resort to artificial semantics and to reason by inapposite analogies. NCN, by definition an oxidizing agent,[15] accounts for approximately one-half of the total volume of sales of explosives and blasting agents in the United States. The Commission concluded that it is a "blasting material"; the examiner found that it was both a "blasting supply" and a

---

10. 92 M.C.C. at page 300.

11. 91 M.C.C. 801.

12. 227 F.Supp. at page 734.

13. 92 M.C.C. at page 299.

14. *Accord:* Andrew G. Nelson, Inc. v. United States, 355 U.S. 554, 558, 78 S.Ct.

496, 2 L.Ed.2d 484 (1958); Burlington-Chicago Cartage, Inc. v. United States, 178 F.Supp. 857, 862 (S.D.Ill.1959); P. Saldutti & Son, Inc. v. United States, 210 F.Supp. 307 (D.N.J.1962); McKenzie Tank Lines, Inc. v. United States, 211 F. Supp. 876 (N.D.Fla.1962).

15. 49 CFR 73.151(a), 73.182(a), note 1.

"blasting material" ; Hercules advertises it as, and considers it to be, a "blasting agent."

It would seem that the Commission's task would be lightened if the parties hereto would supplement the present record by evidence relating to the functional use of NCN and the construction which other shippers and carriers have historically placed upon the term "blasting supplies."

We conclude that the order of the Commission is due to be set aside and the case remanded for further action by the Commission in accordance with the views herein expressed.