[No. 40508. En Banc. November 20, 1969.]

NICK D. ANCHETA *et al., Respondents,* v. MAXINE E. DALY, *Appellant.**

*Reported in 461 P.2d 531.

The *Attorney General,* Richard M. *Montecucco* and *Joseph M. Littlemore, Assistants,* for appellant.

*John R. Stair,* for respondents Blouin and Wiley.

*Vance, Davies, Roberts & Bettis, William A. Roberts,* and *Thomas M. Geisness,* for respondent Boilermakers Local Union No. 104.

*M. Lee Price* and *Bassett, Donaldson & Hafer,* for respondents Electricians & Painters.

FINLEY, J.—This is an appeal from a judgment of the superior court reversing decisions of the commissioner and the appeal tribunal of the Employment Security Department which had disqualified claimants for unemployment compensation benefits on the ground their unemployment was due "to a stoppage of work which exists because of a labor dispute . . ." RCW 50.20.090.

In the summer of 1965 a coast-wide strike occurred involving about 75 shipyards and the Western Regional Machinists' Union. On the afternoon of July 2, 1965, members of Local 79 of the Machinists' Union, employed at Foss Launch and Tug Company, Lake Union Dry Dock, Lockheed Shipbuilding and Construction Company and Todd Shipyards Corporation did not return to work after a union "stop-work" meeting. Not only machinists but members of other trade unions who had been employed at the aforementioned Washington shipyards were unemployed for

most of the 7 weeks' duration of the subsequent strike. A number of these claimed unemployment compensation. The department and the commissioner found that the claimants had been unemployed as a result of a stoppage of work due to a labor dispute and ruled they were thus ineligible for compensation under section 77 of the Washington Employment Security Act (codified as RCW 50.20.090).[1] When the Superior Court for King County set aside the commissioner's action and directed him to award benefits, this appeal followed.

The assignments of error center around five issues: (1) the court erred in its application of standards of review of administrative proceedings; (2) the court erred in finding there was a lay-off which was not the result of a labor dispute work stoppage; (3) the court erred in reversing the commissioner's decision that the claimants were participants and directly interested in the labor dispute; (4) the court erred in finding that even if other claimants were ineligible for benefits, respondents Blouin and Wiley were eligible and would not be precluded from receiving benefits by the "Mark Hopkins" doctrine;[2] (5) the court erred in

---

[1]The provision reads:

"Labor dispute disqualification. An individual shall be disqualified for benefits for any week with respect to which the commissioner finds that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: *Provided,* That this section shall not apply if it is shown to the satisfaction of the commissioner that

"(1) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: *Provided,* That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subdivision, be deemed to be a separate factory, establishment, or other premises."

[2]The "Mark Hopkins" doctrine evolved from the case of *Mark Hopkins, Inc. v. Employment Comm'n,* 24 Cal. 2d 744, 151 P.2d 229, 154

granting legal fees which reflected work performed by counsel during the administrative proceedings.

Before proceeding further, it should be noted that the review of the commissioner's decision was governed by the provisions of RCW 34.04.130 and that the statute was amended by the 1967 legislature, changing the standards for judicial review of administrative action. The standards which were previously applied were found in RCW 34.04.130 (6) which read:

> (6) The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (a) in violation of constitutional provisions; or
>
> (b) in excess of the statutory authority or jurisdiction of the agency; or
>
> (c) made upon unlawful procedure; or
>
> (d) affected by other error of law; or
>
> (e) unsupported by material and substantial evidence in view of the entire record as submitted; or
>
> (f) arbitrary or capricious.

Prior to its amendment the statute had been frequently interpreted by this court. *See, e.g., Northern Pac. Transp. Co. v. State Util. & Transp. Comm'n,* 69 Wn.2d 472, 418 P.2d 735 (1966). *State ex rel. Gunstone v. State Highway Comm'n,* 72 Wn.2d 673, 434 P.2d 734 (1967). We noted in the *Northern Pacific* case that "these so-called standards are somewhat less than all-encompassing and definitive. Case-by-case amplification and clarification are necessary." *Supra* at 478, 418 P.2d at 739. Since the time of that decision, and before the decision of the superior court here involved, subsection (e) as indicated above was amended and now reads: "clearly erroneous in view of the entire record as submitted and the public policy contained in the

---

A.L.R. 1081 (1944). Briefly stated, this doctrine is that any subsequent employment must be bona fide and intended as permanent in order to avoid the statutory labor dispute disqualification for unemployment benefits.

act of the legislature authorizing the decision or order . . ." The commissioner contends that this provision must be interpreted in view of our past decisions on the scope of review of awards of unemployment compensation. If this position were adopted, the review by the superior court would be limited to a determination of whether there is substantial evidence to show that the commissioner did not act in an arbitrary and capricious manner. We take a different view of this matter.

 The legislature was not doing a futile thing in amending the act, and intended to change the scope or basis of judicial review of administrative action. In providing (1) that judicial review was under the provisions of the Administrative Procedure Act (RCW 34.04.130(1)) and (2) in changing subsection (e) conditioning judicial review upon a finding by the court that administrative action was "clearly erroneous in view of the entire record as submitted and the public policy contained in the act . . ." The legislature clearly intended a broader review of all of the evidence.[3] Perhaps the best description of the "clearly erroneous" test was set forth by the United States Supreme Court in *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948): "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a

---

[3] Any short description of the complex interrelationship of agencies and courts is perhaps doomed to confuse rather than to elucidate for precisely the reasons stated by Justice Frankfurter in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 489, 95 L. Ed. 456, 468, 71 S. Ct. 456, 465 (1951):

> Since the precise way in which courts interfere with agency findings cannot be imprisoned within any form of words, new formulas attempting to rephrase the old are not likely to be more helpful than the old.

On the problem of the distinctions which can be drawn between the old test and the new "clearly erroneous" test, *see generally* L. Jaffe, Judicial Control of Administrative Action 600 (1965); 4 K. Davis, Administrative Law § 29.02 (1958). *See also* Peck, *The Scope of Judicial Review of Administrative Action in Washington*, 33 Wash. L. Rev. 55, 71 (1958).

mistake has been committed." *See also United States v. Oregon State Medical Society*, 343 U.S. 326, 96 L. Ed. 978, 72 S. Ct. 690 (1952).

It is true that both of the cases cited above involved the standards of review used by an appellate court in reviewing the findings of fact by a trial court. But just as we do not substitute our judgment for that of the trial court, we do not expect that the superior court will substitute its judgment for that of the administrative body. Just as we give deference to the trial court's observation of the demeanor and testimony of witnesses, we expect that the superior court will give deference to the expertise of the administrative tribunal. In the instant case we are convinced that there was no substitution of judgment, no failure to give deference to the expertise of the administrative tribunal, but that the trial court, with good reason therefor, had a "definite and firm conviction that a mistake" of fact had been committed.

▮ The superior court expressed this conviction in terms of the previously applicable statutory standard regarding review of administrative action. The court's first conclusion of law read:

That as there is no substantial evidence of record to support the commissioner's finding that there was a stoppage of work then in existence at the employers' premises when the appellants and each of them were laid off, such finding is arbitrary and capricious.

The trial court clearly applied the wrong test in reviewing the evidence. In addition, the court amalgamated old subsections (e) and (f) of RCW 34.04.130(6), a practice which we have disapproved. *Northern Pac. Transp. Co. v. State Util. & Transp. Comm'n*, 69 Wn.2d 472, 418 P.2d 735 (1966). But because the trial court articulated the decision under the older, more narrow test does not mean that it cannot be sustained under the broader test which should have been used. We hold that the superior court correctly reversed the factual determination of the appellate tribunal and the commissioner as clearly erroneous in view of the entire record as submitted and the public policy contained

in the act. We do not imply that the court was entirely correct in applying the law to the facts.

Even if respondent's interpretation of the facts is accepted in its entirety and we find that there was a layoff instigated by the various companies involved, it does not follow that this was not unemployment "due to a stoppage of work which exists because of a labor dispute . . ." RCW 50.20.090.[4] In order to determine the correct legal characterization of the unemployment, it is necessary to analyze carefully the Employment Security satute and in particular the labor dispute disqualification.

The disqualification provisions of the Employment Security Act are in large part based upon the fault principle. The preamble to the act itself speaks of aiding "persons unemployed through no fault of their own . . ." and the need to alleviate "involuntary unemployment." RCW 50.01.010.

This fault principle underlies at least four of the grounds for disqualification. Voluntary quit,[5] misconduct,[6] misrepresentation[7] and refusal to work[8] are all predicated on the individual worker's action, in a sense his blameworthiness. The labor dispute disqualification is clearly different in that it applies regardless of fault.

The policy behind the labor dispute provision has been the subject of extensive commentary. It has been called a reflection of the "neutrality" of the state in labor disputes,[9]

---

[4]We do not reach the further question of whether under some circumstances there may be a layoff or unemployment in anticipation of a labor dispute which can fairly be said to be not "due to a stoppage of work . . ."

[5]RCW 50.20.050

[6]RCW 50.20.060

[7]RCW 50.20.070

[8]RCW 50.20.080. Another provision, RCW 50.20.030, governing pregnancy, is more of a limitation on insurance coverage than an actual disqualification.

[9]See, e.g., 1B CCH Unemployment Insurance Rep. 4493-17 § 1980, Bullitt, Unemployment Compensation in Labor Disputes, 25 Wash. L. Rev. 50, 56 (1950); Shadur, Unemployment Benefits and the "Labor

a way to prevent the use of unemployment compensation funds as a means of financing strikes,[10] and a risk of unemployment outside the insurance principle underlying the act.[11] Although there are problems with all of these characterizations, the commissioner is not required to determine which party was responsible for the work stoppage at this point in the application of the statute. All he need apply is a simple causation test: does the work stoppage exist "because of a labor dispute," *i.e.,* would it not have existed but for that dispute.[12]

We think the unemployment in the instant case was "due to a stoppage of work which exists because of a labor dispute."

But this is only part of the puzzle. The legislature did not stop at this point. Based upon the "Draft Bills" of the Committee on Economic Security and in substantial conformity with provisions in most other states,[13] the legislature provided a means or relief or escape from the labor dispute disqualifications for unemployment compensation. The employee is entitled to benefits if he can show that neither he nor any member of a class of which he is a part was "participating in or financing or directly interested in the labor dispute which caused the stoppage of work." There is no indication that any of the claimants financed

*Dispute" Disqualification,* 17 U. Chi. L. Rev. 294, 296 (1950). Both authors point out that true neutrality is impossible as one side is assisted regardless of outcome.

[10]*See, e.g.,* Shadur, *supra* note 9 at 298. The author points out that "the prospect of receiving a fraction of normal wages after the lapse of several weeks will seldom lead a labor organization to call a strike which it would have avoided had benefits not been payable." *Id.* An additional difficulty with this rationale is that the provision cuts far more broadly and disqualifies more than just those out on strike.

[11]*See* Bullitt, *supra* note 9. This theory is criticized in Shadur, *supra* note 9 at 299 n. 22.

[12]Shadur, *supra* note 9 at 315. See also 1B CCH Unemployment Insurance Rep. 4494 § 1980 and 4516 § 1980.655.

[13]Shadur, *supra* note 9 at 294 contains an excellent study of the history and interpretation of these statutes and in particular the labor dispute provision.

the strike by the machinists. However, a further analysis of the record must be made to determine whether the claimants were disqualified because of participation or direct interest in the labor dispute. In making this analysis we are mindful of the admonition by the legislature that the facts should be interpreted to further the "public policy contained in the act . . ." RCW 34.04.130.

The record shows that a number of supervisors directed the various employees to clean up the work areas, remove all air lines and power leads, and to turn in tools. The extraordinary action taken was far beyond that taken for a short work stoppage over a holiday. Some employees were given the impression by supervisors that there would be no further work for the duration of the strike and that they were being laid off. At some point during that afternoon the machinists' union posted pickets at most of the establishments involved. It is uncontroverted that at that time and for some time subsequently members of other crafts did not cross the picket line. However, the law does not require a futile act in order to collect benefits. If there is no work available and the employee has been given every indication that he is laid off, he is not further required to cross a picket line in order to show his lack of participation in the labor dispute.[14] Instead of looking at such symbolic but somewhat meaningless acts, we look at the realities of the situation. The unions other than machinists had already reached an agreement with management. They did not support the strike and, in fact, actively opposed it. The lack of employment and loss of earnings were a considerable hardship to their members. And, what is most significant, when the shipyards did subsequently

---

[14] We have previously held that securing a union permit to work during a strike and refusing to cross a picket line were participating in the labor dispute. *In re St. Paul & Tacoma Lumber Co.*, 7 Wn.2d 580, 110 P.2d 877 (1941); *In re Employees of Pac. Tel. & Tel. Co.*, 31 Wn.2d 659, 198 P.2d 675 (1948). Both cases involved facilities where work was clearly available. However, in this case the superior court, with good reason, found that there would have been no work available had claimants crossed the picket line.

make work available, the members of the other unions did cross the machinists' picket line en masse and returned to their jobs. On the basis of our reading of the record, we think it must be said that the commissioner and the department were clearly erroneous in view of the entire record and the public policy contained in the act. The superior court was clearly correct when it found "[t]hat the appellants were ordered to secure the jobs upon which they were working, turn in their tools, which was not a normal procedure, and were advised by foremen or leadmen that the jobs were to be shut down and that they were laid off until the dispute between the employer and the machinists was resolved."

■ This leaves the possibility that the claimants, or someone in their grade or class of worker, were directly interested in the labor dispute. In this regard, this case is quite similar to *Wicklund v. Commissioner of Unemployment Comp.*, 18 Wn.2d 206, 138 P.2d 876, 148 A.L.R. 1298 (1943). There, as here, more than one union was involved. There, as here, the strike by the one union was opposed by the other workers because it put them involuntarily out of work. There, as here, the concessions granted by the employer accrued to the benefit of all employees.[15] We held in *Wicklund* that this was not enough to show direct interest. We stated at that time "The words 'directly interested in the labor dispute' are clearly limited in their application to those employees directly interested in furtherance of the dispute by participation and activity therein." *Supra* at 214. Although there are some shortcomings in this definition of "directly interested,"[16] we believe that there was no direct

[15]There were two cases involving two strikes consolidated in *Wicklund*. The nonstriking employees received wage increases and other benefits as a result of the first strike only.

[16]We are not unaware of the criticism of *Wicklund* and *Kieckhefer Container Co. v. Unemployment Comp. Comm'n*, 125 N.J.L. 52, 13 A.2d 646 (1940) upon which it relies. *See* Bullitt, *supra* note 9 at 64; Note, *Eligibility For Unemployment Benefits of Persons Involuntarily Unemployed Because of Labor Disputes*, 49 Col. L. Rev. 550, 563 (1949). However, we believe that the test there applied, with the addition of an economic analysis to determine whether there was a real, significant

interest by the claimants based both upon the lack of participation by the claimants coupled with a recognition that the minimal penny an hour wage increase was in no real sense an economic benefit when compared with the long period during which the claimants were out of work. We are convinced that the claimants were within the relief provisions of RCW 50.20.090 and are entitled to unemployment benefits.

In view of our resolution of this question, we do not reach the further question of whether the "Mark Hopkins" doctrine, if adopted by this court, would affect respondents Blouin and Wiley.

The final question before us concerns the allowance of attorneys' fees out of the unemployment compensation administration fund. Such fees are generally allowed by RCW 50.32.160:

> Attorneys' fees in courts. It shall be unlawful for any attorney engaged in any appeal to the courts on behalf of an individual involving the individual's application for initial determination, or claim for waiting period credit, or claim for benefits to charge or receive any fee therein in excess of a reasonable fee to be fixed by the superior court in respect to the services performed in connection with the appeal taken thereto and to be fixed by the supreme court in the event of an appeal thereto, and if the decision of the commissioner shall be reversed or modified, such fee and the costs shall be payable out of the unemployment compensation administration fund. *In the allowance of fees the court shall give consideration to the provisions of this title in respect to fees pertaining to proceedings involving an individual's application for initial determination, claim for waiting period credit, or claim for benefits.* In other respects the practice in civil cases shall apply.

(Italics ours). The superior court included proceedings before the administrative agency in awarding fees of $2,000 for each law firm and $726.76 to counsel for respondents Blouin and Wiley. The commissioner contends that only

and direct interest in the outcome of the dispute, reflects the intent of the legislature as well as diminishes the possibility of a "key man" strike being used to circumvent RCW 50.20.090.

fees for court proceedings are payable out of state funds. The emphasized portion of the statute gives the court authority to consider other provisions of the act in its considerations as to a proper fee. Two provisions which are pertinent are RCW 50.32.100[17] and RCW 50.32.110.[18] In RCW 50.32.100, it is specifically provided that "fees and all costs . . . *except charges for services rendered by counsel* . . . shall be paid out of the unemployment compensation administration fund." (Italics ours). We believe the purpose of the statutes when read together is to provide for regulation of attorney fees incurred in relation to administrative or court proceedings. Furthermore, when the commissioner erroneously denies unemployment compensation, the subsequent fees and costs incurred in court proceedings are compensable from state funds. Since there is no evidence in the record showing how the superior court determined the fees allowed, we must remand this case for a determination as to what would constitute reasonable attorney fees at both the administrative level and in the superior court. Only those fees and costs for services in the

[17]"50.32.100 Costs. In all proceedings provided by this title prior to court review involving dispute of an individual's initial determination, or claim for waiting period credit, or for benefits, the fees of all witnesses attending such proceedings pursuant to subpoena shall be paid at the rate fixed by such regulation as the commissioner shall prescribe and such fees and all costs of such proceedings otherwise chargeable to such individual, except charges for services rendered by counsel or other agent representing such individual, shall be paid out of the unemployment compensation administration fund. In all other respects and in all other proceedings under this title the rule in civil cases as to costs and attorney fees shall apply: *Provided,* That cost bills may be served and filed and costs shall be taxed in accordance with such regulation as the commissioner shall prescribe."

[18]"50.32.110 Fees for administrative hearings. No individual shall be charged fees of any kind in any proceeding involving the individual's application for initial determination, or claim for waiting period credit, or claim for benefits, under this title by the commissioner or his representatives, or by an appeal tribunal, or any court, or any officer thereof. Any individual in any such proceeding before the commissioner or any appeal tribunal may be represented by counsel or other duly authorized agent who shall neither charge nor receive a fee for such services in excess of an amount found reasonable by the officer conducting such proceeding.

appeal to the superior court shall be compensable out of the unemployment compensation administration fund.

In addition, we note that this court is to set fees "in the event of an appeal thereto." We hereby fix fees of $500 for each firm involved and $500 for the individual counsel, payable out of the unemployment compensation administration fund.

Subject only to modification as provided herein, the judgment of the superior court should be affirmed. It is so ordered.

HUNTER, C. J., HILL, WEAVER, ROSELLINI, HAMILTON, HALE, and McGOVERN, JJ., and DONWORTH, J. Pro Tem., concur.