[No. 328-2.    Division Two.    February 28, 1972.]

DAVID J. WILLIAMS *et al., Respondents,* v. WILLIAM YOUNG *et al., Appellants.*

*Slade Gorton, Attorney General, Charles F. Murphy, Assistant, Robert O. Beresford* and *Donald P. Lehne* (of *Beresford & Booth*), for appellants.

*Alfred J. Schweppe* (of *Schweppe, Doolittle, Krug & Tausend*), for respondents.

PETRIE, C.J.—On the afternoon of August 28, 1969, the membership of Highline Savings and Loan Association adopted a resolution, which amended its articles of incorporation and its bylaws so as to change the par value of its permanent nonwithdrawable stock from $10 per share to $1 per share.[1] The immediate effect of the adoption of such a resolution was a tenfold increase in the voting potential of those "members" who were owners of such stock certificates. More particularly, since the resolution in no way altered the voting potential of the depositor members, the resolution caused a shift in the balance of the voting potential from a previous 40,000 for stockholders and approximately 260,000 for depositors[2] to 400,000 for stockholders as against the same 260,000 for depositors.

Within a few days after passage of the resolution, it was approved by Mr. William E. Young, Supervisor of the Division of Savings and Loan Associations of the State of Washington. Notwithstanding such approval, a petition was filed before the supervisor on behalf of depositors and on behalf of stockholders seeking a declaratory ruling pursuant to RCW 34.04.080[3] to invalidate the election because

[1] RCW 33.48.030, initially enacted in 1955, required that stock savings and loan associations shall have a permanent nonwithdrawable stock of the par value of 100 dollars per share. The section was amended in 1963 so as to authorize reduction of the par value to 10 dollars per share; and again in 1969 to 1 dollar per share. (Laws of 1963, ch. 246, § 9; Laws of 1969, ch. 107, § 7.)

[2] RCW 33.20.010 provides that an association, by its bylaws, may provide that each savings member shall be entitled to one vote for each one hundred dollars of his savings account.

[3] RCW 34.04.080 provides: "On petition of any interested person, an agency may issue a declaratory ruling with respect to the applicability to any person, property, or state of facts of any rule or statute enforceable by it. A declaratory ruling, if issued after argument and stated to be binding, is binding between the agency and the petitioner on the state of facts alleged, unless it is altered or set aside by a court. Such a ruling is subject to review in the superior court of Thurston county in the manner hereinafter provided for the review of decisions

of alleged irregularities which occurred at the meeting. On February 27, 1970, the supervisor issued a ruling refusing to disturb his prior approval of the resolution. Upon petition therefore, the matter was reviewed in Superior Court for Thurston County. On June 22, 1970, the court entered an order (1) setting aside the supervisor's declaratory ruling, (2) declaring the vote by which the resolution was adopted to be null and void, and (3) directing the supervisor to take all necessary steps to give effect to the court's order. This appeal by the supervisor and by Highline (which had previously been granted permission to intervene) followed.

Prior to setting forth the facts with any greater particularity, it seems appropriate that we should pause briefly to examine the precise role of this court at this stage of proceedings.

The Division of Savings and Loan Associations is a division of the Department of General Administration. The supervisor of that division is a public officer whose agency is totally subject to the provisions of the Administrative Procedures Act, RCW 34.04. Judicial review of agency ruling, including a ruling pursuant to RCW 34.04.080, is limited by RCW 34.04.130, whose pertinent provisions provide as follows:

(6) The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

. . .

(e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or

(f) arbitrary or capricious.

Arbitrary and capricious action on the part of an administrative agency is willful and unreasoning action, in

in contested cases. Each agency shall prescribe by rule the form for such petitions and the procedure for their submission, consideration, and disposition."

disregard of facts and circumstances. Action is not arbitrary and capricious when exercised honestly and upon due consideration of the facts and circumstances. *Northern Pac. Transp. Co. v. State Util. & Transp. Comm'n,* 69 Wn.2d 472, 418 P.2d 735 (1966). There is nothing in the record to indicate that the supervisor's action, in any sense of the word, was willful and unreasoning or in disregard of facts and circumstances. We reject, therefore, any contention that the supervisor's decision was arbitrary and capricious.

■ Whether or not the supervisor's action was clearly erroneous in view of the entire record and the public policy contained in the authorizing legislation permitting the supervisor to act, requires the trial court and us to evaluate the entire record and to determine whether or not, after such review, we are left with the definite and firm conviction that a mistake has been committed. *Ancheta v. Daly,* 77 Wn.2d 255, 461 P.2d 531 (1969); *Newbury v. Department of Pub. Assistance,* 80 Wn.2d 13, 491 P.2d 235 (1971). In that sense, the limits of our review are broader than a mere search to determine whether or not there is substantial evidence in the record to support the agency's findings or decision. *Ancheta v. Daly, supra.*

To capture the full flavor of the factual circumstances it would be necessary to review the entire transcript of the membership meeting of August 28, 1969. A synopsized version of facts includes the following: Mr. David J. Williams, one of the founders of Highline Savings and Loan Association, erstwhile president and counsel thereof, and still a stockholder and director, was not present at the meeting. Mr. Clarence Carlson, who was not identified other than as a longtime depositor, whose account had been substantially increased the day before the meeting, was present and did engage in a critical discussion with the current president of Highline, Mr. Harry F. Kittleman. All the directors, except Mr. Williams, were present at the meeting but took relatively little active part therein.

After explaining that the purpose of the meeting was approval or rejection of a resolution previously adopted by

the board of directors, which resolution altered both the articles of incorporation and the bylaws by changing the par value of the guaranty stock from $10 per share to $1 per share, Mr. Kittleman called for discussion from the floor. Part of that discussion follows:

MR. CARLSON: Clarence Carlson. Just how will this tax split benefit and who will it benefit?

MR. KITTLEMAN: You said tax split?

MR. CARLSON: Stock split.

MR. KITTLEMAN: Stock split. The situation will remain practically the same. It means you are splitting the stock ten to one.

MR. CARLSON: In other words this will mean the stock will have ten votes than to one they have now.

MR. KITTLEMAN: I don't follow you.

MR. CARLSON: They have ten shares—they will have ten votes, whereas now they have one vote.

MR. KITTLEMAN: Yes, that is true.

MR. CARLSON: What about depositors? How will it benefit them?

MR. KITTLEMAN: Their situation remains exactly the same as it always has been.

MR. CARLSON: They lose ground when they are voting.

MR. KITTLEMAN: I don't get that. I would say to you that if you have an argument on this you go ahead and make your presentation.

MR. CARLSON: The stockholder is gaining ten votes; the depositor still has his one vote. He is losing ground, isn't he? The depositor doesn't have as much to say then.

MR. KITTLEMAN: Yes, I might take just the time to reply to the question to give you something of the history of Savings and Loan Associations . . .

. . .

MR. KITTLEMAN: You asked a question—are they losing ground? I would say they are in the relative position that they have always been in, in the same relative position.

Savings and Loan Associations were organized as mutuals years ago for the purpose of gathering together enough funds to finance certain projects. They started as local groups and virtually grew and became State groups and now you have national groups.

The latest movement in the matter of Savings and Loans has been the creation of stock companies, which is one of this type and we are a stock company. We can

control the voting of the stock but not of the savings depositors.

In more of the cases the voting of the shareholders is done by proxy vote and if you know, very few savings members do attend these meetings of any Associations, and in this manner we give more substantial leadership to the Association—that is we leave it up to a few depositors who are only interested in the safety of their money and the continued payment of the highest rate of dividends, which this Association has always given.

. . .

MR. CARLSON: They still are losing votes though.

MR. KITTLEMAN: That is relative. If the savings and the Association should multiply two, three or four times, no. It depends on what your savings are.

. . .

MR. CARLSON: Well I feel that this is quite a decision to make at this time. I also feel that the depositors should be notified that they will be losing voting rights.

And until this is done, I put in a movement for an adjournment of this meeting.

The meeting was not adjourned, however, until Mr. Kenneth A. MacDonald, an attorney who had previously represented Mr. Williams in prior litigation involving Highline, gave a rather thorough and complete explanation of the effect of the resolution before the membership. The votes were cast, and the resolution was adopted.

Within a few days of the meeting, the supervisor, one of whose staff attended the meeting, approved the adoption of the resolution. Notwithstanding said approval, this formal action was instituted as a class action, by Mr. Williams as a stockholder and by Mr. Carlson as a depositor, seeking to have the supervisor issue a ruling declaring the vote, by which the resolution was adopted, null and void.

Williams and Carlson contend that Kittleman—and the other directors present, by their silence—misrepresented and fraudulently concealed the true state of facts because not one word of the shift in the voting status was divulged to the members present by the directors, who were under an affirmative duty imposed by statute and common law to advise the depositors completely and faithfully as to the

effect of an affirmative vote on the resolution. More particularly, they contend that Kittleman's responses as to the effect of the resolution upon the depositors "Their situation remains exactly the same as it always has been", and "They are in the same relative position they have always been in", violate the provisions of RCW 33.36.060[4], and are totally inconsistent with a director's fiduciary responsibility imposed by RCW 33.16.060[5] and by common law. Thus, the argument continues, these responses so thoroughly tainted the proceedings as to make it an illegal meeting as well as to render unconscionable any attempt to support the result of the election.

Preparatory to ascertaining whether or not a mistake has been made, we deem it necessary first to examine the statutory enactments which authorize the supervisor to make the decision.

RCW 43.19.100 demands that, in order to qualify for the position of Supervisor of Savings and Loan Associations, a candidate have at least 2 years' practical experience in savings and loan employment, examination, or supervision. Once appointed, the supervisor is charged with the responsibility of administering and enforcing all the statutory regulations bearing on the manner in which savings and

---

[4]RCW 33.36.060 provides: "Any person who, for the purpose of concealing any material fact, shall suppress any evidence or abstract, remove, mutilate, destroy, or secrete any book, paper or record of an association, or of the supervisor, or of anyone connected with the association or the office of the supervisor, shall be guilty of a felony."

[5]RCW 33.16.060 provides: "Directors and officers of an association shall be deemed to stand in a fiduciary relation to the association and shall discharge the duties of their respective positions in good faith and with that diligence, care, and skill which ordinary, prudent men would exercise under similar circumstances in like position.

"Each director named in the articles of incorporation shall take and subscribe to an oath in writing, before commencing to serve, that each will, so far as the duty devolves upon him, diligently and honestly administer the affairs of the association and will not knowingly violate the laws of the state of Washington or the bylaws of the association in so doing; and each new director, before commencing to serve, shall take such oath. The oaths of the several directors shall be filed with and retained by the supervisor."

loan associations under his jurisdiction conduct their business affairs. RCW 33.04.020. In particular, he must either approve or refuse to approve articles of incorporation and bylaws of savings and loan associations and any amendments thereto. RCW 33.08. Courts can expect, therefore, that a supervisor possesses a reasonable degree of expertise in the field, including a general working knowledge of the voting customs prevailing at membership meetings.

With these preliminary considerations in mind we turn to the record to ascertain whether or not substantial rights of stockholders or depositors may have been prejudiced because of the supervisor's decision to approve the amendments to Highline's articles of incorporation and bylaws. So far as we can discern, there is no reason ascribed as to how the rights of *stockholders* as a class may have been prejudiced by reason of the supervisor's approval of the results of the election. Neither can we understand how such rights may have been prejudiced—either to the stockholders as a class or to Mr. Williams as an individual stockholder.

We focus, therefore, on the rights of *depositors* as a class and upon the rights of Mr. Carlson as an individual depositor. It should be borne in mind that Mr. Carlson does not in any way challenge the validity, sufficiency, or efficacy of the notice or call of the meeting. Rather, it was the action of the directors *during the course of the meeting* which he finds reprehensible. The gravamen of his contention, as reflected in his petition to the supervisor, is that at no time did Mr. Kittleman answer his question as to the effect of the stock split upon the depositor's vote nor did he in any way indicate that the explanation given by Mr. MacDonald was correct.

Although Mr. Carlson indicated, in testimony before the supervisor, that he was not sure (at the time of the meeting) that a favorable vote on the resolution would increase the voting rights of stockholders 10 votes for every 1 previously held, it seems to us that he was quite adequately informed by Mr. Kittleman of that fact. Furthermore, it is also quite clear that he understood voting rights of deposi-

tors were not being increased by the resolution. His contention, therefore, is simply that Kittleman's statement, that the depositors were in the same relative position in which they have always been, constituted a fraudulent misrepresentation of the true state of the facts.

■  Were we to review the transcript of the membership meeting as though it took place within the confines of a sterile vacuum, we should likely find considerable merit to Mr. Carlson's contentions. However, we are required, and certainly the supervisor was authorized, to view the proceedings through the glass of reality as it exists in this corner of the financial world. Once having acknowledged that the stockholders' voting potential was being increased to 10 votes for every 1 previously held, and once having conceded that depositors' votes were not being changed, any answer to Mr. Carlson's questions would have been incomplete without having taken into consideration, and having explained, both the dramatic postwar increase in savings deposits experienced by savings and loan associations and the general well-known practice of depositors of exercising their voting rights by proxy.

Furthermore, it is apparent that the relative cumulative voting rights of depositors vis-a-vis stockholders is a constantly changing process, albeit never as explosive a change as had been granted to stockholders pursuant to statutory authorization in 1963 and 1969. But the cumulative voting potential of the respective two groups of "members", at any given point in time, would have no particular practical significance to an individual depositor, except to the extent that a depositor might attempt to acquire other depositors' proxies. There is no indication that Mr. Carlson was attempting to gather proxies.

We do not find that Mr. Kittleman—or any of the other directors—breached any fiduciary duty owed to the association or to the depositors, nor do we find that Mr. Kittleman and the other directors suppressed any evidence for the purpose of concealing any material fact in violation of RCW 33.36.060. We are not left with any firm conviction

that the supervisor committed a mistake in approving the amendments to Highline's bylaws and articles of incorporation. Neither do we view as a mistake the supervisor's approval of the election at which the amendments were adopted.

Judgment reversed, and the supervisor's declaratory ruling reinstated.

PEARSON and ARMSTRONG, JJ., concur.

Petition for rehearing denied April 5, 1972.

Review denied by Supreme Court May 24, 1972.