[No. 591-42164-3. Division Three. March 2, 1973.]

FARM SUPPLY DISTRIBUTORS, INC., *Respondent,* v. WASHING-
TON UTILITIES AND TRANSPORTATION COMMISSION *et al.,*
*Appellants.*

*Slade Gorton, Attorney General, James R. Cunningham, Assistant,* and *Boyd Hartman* (of *Hartman & McGuire*), for appellants.

McINTURFF, J.—This case involves an action by the respondent to acquire authority from the Washington Utilities and Transportation Commission (hereinafter referred to as the Commission), to operate as a contract carrier in serving the transportation needs of Rockford Grain Growers. Two common carriers contested the application.

A Commission examiner conducted a fact-finding hearing and issued a proposed order granting the application for a contract carrier permit. The Commission in turn denied the application. Respondent appealed this decision to the Spokane County Superior Court, where the decision was reversed. This appeal followed.

The appellants base their appeal on three alleged errors: (1) the trial court exceeded the scope of judicial review; (2) the trial court erred in holding that the respondent met the statutory definition of a contract carrier; and (3) the trial court erred in holding that the application was consistent with public interest.

A short description of the services of the respondent is necessary. Respondent hauls commodities for Rockford Grain Growers. Those commodities are liquid petroleum products; fertilizer in bulk, bags and containers; molasses; beet pulp and pellets; feed grain mixture; bale twine and wire; and seed grain. Respondent's equipment includes flatbed trailers with three hopper bottoms and folding side racks used mostly for hauling bag fertilizer on pallets. The respondent also operates equipment with combination liquid and dry tanks, allowing it to haul dry bulk commodities

in one direction, and liquid commodities on the return. In one particular trailer there are five separate compartments, the front and back compartments being for liquids and the three center ones for dry products.

This equipment is significant, being used only for special purposes, and has been devoted exclusively to operations of the Rockford Grain Growers. Few, if any, other carriers offer this type of equipment. The respondent made available, 24 hours per day, an individual solely responsible for loading and unloading products at the co-op storage facilities. The presence of this one individual lessened the chances of mistakes and allowed night service. This equipment was devoted exclusively to the operations of Rockford Grain Growers at all times.

■■ The first question to be determined is whether the trial court exceeded the scope of judicial review by substituting its judgment for that of the Commission. Judicial review of agency rulings is limited by RCW 34.04.130, which provides in pertinent part:

> (6) The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> . . .
>
> (e) *clearly erroneous* in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; . . .

(Italics ours.) To determine whether the Commission's findings were clearly erroneous in light of this statute, the trial court must review the complete record and determine whether or not it is left with the definite and firm conviction that a mistake has been committed. *Ancheta v. Daly*, 77 Wn.2d 255, 259, 461 P.2d 531 (1969); *Tunget v. State Employment Security Dep't*, 78 Wn.2d 954, 481 P.2d 436 (1971); *Newbury v. State Dep't of Pub. Assistance*, 80 Wn.2d 13, 491 P.2d 235 (1971); *Williams v. Young*, 6 Wn. App. 494, 494 P.2d 508 (1972); *United States v. United*

*States Gypsum Co.,* 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948). Appellants argue that the trial court substituted its judgment for that of the administrative agency, and that it failed to give deference to the expertise of the administrative tribunal. We disagree.

The question to be determined at this level is not whether the Commission's findings were clearly erroneous. The question is whether the superior court's decision that the Commission's findings were clearly erroneous is supported by substantial evidence. The Commission's findings of fact are prima facie correct. The burden is upon the one attacking the findings in the trial court to show that they are clearly erroneous in view of the entire record (*see Ancheta v. Daly, supra*). As noted in *Northern Pac. Transp. Co. v. State Util. & Transp. Comm'n,* 69 Wn.2d 472, 477, 418 P.2d 735 (1966):

> The presumption thus statutorily and logically accorded commission findings and conclusions does not place this court or the reviewing superior court in the role of a mere rubber stamp, acquiescing in blind, rigid obeisance to the omnipotent expertise of the particular administrative agency involved. But it does mean that this court will not substitute its judgment for the judgment of the commission (or any other agency) on a disputed factual issue. *State ex rel. Byram v. Department of Pub. Works,* 144 Wash. 219, 257 Pac. 634 (1927); *Pacific Coast Elevator Co. v. Department of Pub. Works,* 130 Wash. 620, 228 Pac. 1022 (1924).

*See Ancheta v. Daly, supra; Williams v. Young, supra; United States v. United States Gypsum Co., supra; United States v. Oregon Med. Soc'y,* 343 U.S. 326, 96 L. Ed. 978, 72 S. Ct. 690 (1952).

In nonagency decisions, when this court has the task of reviewing findings of fact entered by the trial court, its review is limited to determining whether or not there is substantial evidence to support findings of the trial court. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959). This rule has its origin not only in stare decisis (*see Fischler v. Nicklin,* 51 Wn.2d 518, 319 P.2d 1098

(1958)), but also in article 4, section 6 of the Washington Constitution (*see Thorndike v. Hesperian Orchards, Inc., supra; Stringfellow v. Stringfellow*, 56 Wn.2d 957, 350 P.2d 1003, 353 P.2d 671 (1960); *Dobias v. Western Farmers Ass'n*, 6 Wn. App. 194, 491 P.2d 1346 (1971)).

Chief Justice Hughes, in *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 83 L. Ed. 126, 59 S. Ct. 206 (1938), said:

> *Substantial evidence* is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

(Italics ours.)

The rationale behind this constitutional interpretation and hardfast rule of appellate review is that the heart of the fact-finding process consists of drawing inferences from the evidence. A fact finder may draw inferences from the words or gestures or reflections or demeanor of witnesses. He may infer a significant fact from the testimony of one or more witnesses on one side or on both sides, and may by the witnesses' demeanor believe one witness and disbelieve another.

Not so with three bodies concerned with this decision: the Commission, the trial court, and this court. In this case only the initial examiner could determine the credibility of the witnesses. The review bodies are left to a cold-record review. An agency, in the instant case the Commission, has the power to substitute its judgment for that of the examiner on factual questions, including credibility of witnesses observed by the examiner and not by the agency. *Federal Communications Comm'n v. Allentown Broadcasting Corp.*, 349 U.S. 358, 99 L. Ed. 1147, 75 S. Ct. 855 (1955). A reviewing court, in determining whether the agency's findings are clearly erroneous, may take into consideration the views of the examiner. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 95 L. Ed. 456, 71 S. Ct. 456 (1951). In the present case the views of the examiner are set forth meticulously and are firmly embedded in the evidence.

We recognize *Williams v. Young, supra,* which seems to hold that this court and the Supreme Court may review agency findings to determine whether we are left with a definite and firm conviction that a mistake has been committed. In the landmark *Ancheta* case the court did not determine whether they were left with a definite and firm conviction that a mistake had been made, but stated, at page 260:

> In the instant case we are convinced that there was no substitution of judgment, no failure to give deference to the expertise of the administrative tribunal, but that the trial court, with good reason therefor, had a "definite and firm conviction that a mistake" of fact had been committed.

We hold that the clearly erroneous test of judicial review in RCW 34.04.130 applies only to the superior court. Public policy demands an end to substitution of judgment. The constitution limits an appellate court in its review of superior court findings (Washington Constitution, article 4, section 6). Review is solely to determine if there is substantial evidence to support the trial court's findings. *Stringfellow v. Stringfellow, supra.*

We find that the trial court did not substitute its judgment for that of the Commission. There is substantial evidence to support the trial court's findings and conclusions that the Commission's decision was clearly erroneous.

Did the trial court err in holding that the respondent met the statutory definition of a contract carrier? To differentiate between common carrier and contract carrier we must consider the following statutes:

RCW 81.80.010 (4) provides:

> "Common carrier" means any person who undertakes to transport property for the general public by motor vehicle for compensation, whether over regular or irregular routes, or regular or irregular schedules, including motor vehicle operations of other carriers by rail or water and of express or forwarding companies.

RCW 81.80.010 (5) provides:

> "Contract carrier" shall include all motor vehicle opera-

tors not included under the terms "common carrier" and "private carrier" as herein defined in paragraph (4) and paragraph (6), and further shall include any person who under special and individual contracts or agreements transports property by motor vehicle for compensation.

RCW 81.80.010(6) provides:

A "private carrier" is a person who transports by his own motor vehicle, with or without compensation therefor, property which is owned or is being bought or sold by such person, or property of which such person is the seller, purchaser, lessee or bailee where such transportation is incidental to and in furtherance of some other primary business conducted by such person in good faith.

RCW 81.80.070 sets forth the standard for granting or denying a carrier's permit:

A permit . . . shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the services proposed . . . , and that such operations will be consistent with the public interest, . . .

One who applies for a contract carrier's permit must show that the transportation services he offers are so tailored to the unique needs of a particular shipper that common carriers cannot provide such a service in the normal course of business. *See P. Saldutti & Son, Inc. v. United States,* 210 F. Supp. 307 (D.N.J. 1962); *National Trailer Convoy, Inc. v. United States,* 227 F. Supp. 730 (N.D. Okla. 1964); *Baggett Transp. Co. v. United States,* 231 F. Supp. 905 (N.D. Ala. 1964). The court has noted in *Black Ball Freight Serv., Inc. v. State Util. & Transp. Comm'n,* 74 Wn.2d 871, 447 P.2d 597 (1968) that the Interstate Commerce Commission cases "constitute cogent authority" insofar as they deal with the issue of determining whether one is a contract carrier.

In Pregler, *Extension of Operations,* 23 M.C.C. 691, 694 (1940) the Interstate Commerce Commission stated:

As seen, a contract carrier is not only one who does not come within the definition of a common carrier by motor

vehicle, that is, one who does not undertake to serve the general public, but one who also renders a transportation service for compensation "under special and individual contracts or agreements." This latter requirement is not merely that the transportation be performed under contract. Whatever the contract or agreement, it must be special and individual. It goes to the subject matter of the contract and means a special and individual service which is required by the peculiar needs of a particular shipper.

It should be carefully noted at this point that the Commission's examiner granted the application, making finding of fact No. 4:

Applicant performs and undertakes the following accessorial services under the contract: (a) special operating knowledge of the machinery and facilities used to load and deliver commodities to the plant and to make proper distribution within the plant; (b) can move and load grain without the danger of mixture or contamination; and (c) available both night and day on demand to draw, load, or move each and every type of commodity in the plant.

Based upon this finding the examiner made the following conclusion of law:

3. The proposed service will fulfill the distinct, specialized and peculiar needs of the shipper and will be consistent with the public interest.

After review the superior court made finding No. 4, as follows:

The findings of the Hearing Examiner that the services proposed by Farm Supply Distributors, Inc. constitute special services and are properly characterized as contract carrier operations are fully supported by the evidence of record, and the contrary findings of the respondent Commission in its Final Order and Order on Reconsideration to the effect that such services are, in fact, no different from those of a common carrier, are not supported by evidence and are clearly erroneous in view of the entire record as submitted. Farm Supply Distributors, Inc. does in fact render special services that are essentially a part of being a contract carrier as opposed

and in contrast to those characterizing a common carrier.

Earlier in this opinion the specialized equipment used by the respondent was described and the commodities shipped by that equipment were specified. The contention of the carriers is in essence that it can duplicate the service of the respondent. Therefore, the primary issue concerns another fact contended by the respondent to be determinative, *i.e.*, always being available to load and unload the commodities, whether it be day or night, with no fear of contamination. Mr. Rex Peace, owner of respondent company, testified he did do all of the loading and unloading himself and, by so doing, kept down the contamination.[1]

Mr. Ralph L. Richmond, the manager of Rockford Grain Growers, testified that the respondent had the kind of specialized equipment which Rockford Grain Growers needs, and that Peace would load and unload commodities at any time. Also, Richmond testified that Peace was a responsible individual and the only one, other than their own personnel, they would allow to load and unload their commodities.[2] Richmond said Peace's ability to haul both

[1] "Q You have shown pictures of the equipment which will be used. What, if any, specialized experience or knowledge or service do you intend to render under this proposed operation? A Well, I take care of the unloading and loading at nights—well, in fact, all the time. I do all of the loading and unloading myself. Q And why do you contend that this is specialized service—if you so contend? A I do this to keep down contamination, in other words mixture of products; as well as keeping the mixture of grain down. In the elevator, for instance, there's peas, there's brewery barley, there's wheat, there's seed barley, there's oats. And if you don't know how to handle it, you can have any one or all of them mixed together by just opening the wrong bin. And the fertilizer, there's five different kinds go in there. And I can open valves and run it through all of those from one place. I could run into all the wrong tanks even from one hookup."

[2] "Q What need for special services, if any, do you have from the applicant? A Well, the thing that he is providing in addition to the specialized equipment is the fact that he can insure—and this is he himself, the same man, irregardless of what time loads come in, the same man can unload the product in our facility; he is familiar and trained in operation of all of our elevators so that he can go to any of the six and load grain whether it be day or night. And the fact that he

ways was a savings of at least $10,000 a year to Rockford Grain Growers.

The uniqueness of Farm Supply's services was supported by Richmond's statement that Rockford Grain Growers in the past had not been able to get trucks when needed and that they were not able to rely on other carriers to meet their needs.[3]

Representatives of the protesting carriers claimed they could duplicate Farm Supply equipment. However, they could not have a man on the site to supervise loading and unloading without charging much more money. They said that their men could be trained to deal with the specific problems, using a locking system, with keys to unlock only the right lock, so there would be no contamination. They further said that they were insured against negligent contamination or other damage.

 Is the unloading and loading of commodities day or night, without fear of contamination, a transportation serv-

---

can do this when we are in our rush season of fertilizing—it is nearly impossible to unload products during the day—Q What could possibly happen if you had an untrained man in there? A Well, all of our connections, with the exception of these two big tanks, are in a real limited space. All of the connections are within just a few feet. And if somebody would come in and accidentally put a load of one kind of sulfur in the wrong tank, this would set up and get so that you—well, I don't know how you'd get it out. It just sets up extremely hard."

[3]"A I believe I'm saying this because many, many times we have not been able to get trucks when we need them to move the commodity. Q The only advantage of his particular equipment is in the two-way haul situation? A No. Q From haul and back haul? A He is available when we need him. And we can't rely on the other carriers to supply our needs. Now, the other benefit I think we have to discuss is this service you receive from the applicant that you can't get from other carriers. I think it was described partially as what he does to help load and unload, and I'm going to ask you to be more specific and say just what service this is that you get from the applicant. A He is responsible for—and he is the only one that we will allow, other than our own personnel, to load and unload these commodities. When he comes out and does this at night there is a savings of our manpower. This is part of the service that Mr. Peace provides. I think I can go on and say that, conservatively, I feel that these units, by hauling both ways, have meant a savings to Rockford Grain Growers of at least $10,000 a year."

ice within the act? Counsel for the carriers and the Commission cite the following federal cases in defining "transportation services": *Interstate Commerce Comm'n v. J-T Transp. Co.*, 368 U.S. 81, 7 L. Ed. 2d 147, 82 S. Ct. 204 (1961); *National Trailer Convoy, Inc. v. United States,* 227 F. Supp. 730 (N.D. Okla. 1964); *Baggett Transp. Co. v. United States,* 231 F. Supp. 905 (N.D. Ala. 1964). In *Interstate Commerce Comm'n v. J-T Transp. Co., supra* at 210, it is stated that the standard is not whether the existing services are "reasonably adequate" but whether a shipper has a "distinct need" for a different or more select or more specialized service, and that the protesting carriers must show they can fill that distinct need, not that they can provide a reasonably adequate service.

The precise issue in *Interstate Commerce Comm'n v. J-T Transp. Co., supra,* is whether the Commission indulged in the impermissible presumption that existing service is reasonably adequate until proven inadequate by the applicant and its supporting shipper. The court concluded that the burden of proof was *misplaced* and that the existing carrier must prove affirmatively the adequacy of its service. R. G. Cisney, who appeared for one of the carriers, testified that the services to the shipper were indeed unique.[4] John R. Clark, testifying for one of the carriers, said that this operator could not put an assigned man at the plant, nor furnish anyone other than the driver to load or unload.[5]

---

[4] "Q Disregarding the proposition of having a driver employee available for all loading and unloading, do you feel in providing the service to the shipper as suggested there would be anything unique or different than the service you normally provide to other shippers? A Yes, very definitely. Q Would you explain that. A Our rates and operations are built upon our driver loading the load, taking it to the destination, unloading it, and returning."

[5] "Q What is Consolidated Freightways able to offer in respect to that service requirement—or stated requirement? A We have the equipment available to handle the two-way haul mentioned in his testimony. We cannot put a single man at his plant—or a single man other than the driver of our equipment at his plant to load or unload. However, we have the same latitude as PIE in being able to place this type of operation up for bid and put a trained driver on it to be the sole driver to handle products into that plant."

There is no fine line stating what are and what are not transportation services. We conclude the acts of the respondent in being available 24 hours a day to load and unload the commodities in the various storage tanks or grain elevators, with little or no chance for contamination of products, is a transportation service unique to the operation of the Rockford Grain Growers. This service, along with the specialized equipment that few, if any, other carriers have, satisfies the test of the cases cited.

Finally, did the trial court err in holding that respondent's application was consistent with public interest? We believe not.

First, the Commission in its findings of fact never passed on the question of public interest. It made a bare conclusion of law unsupported by findings, that the application was not consistent with public interest. RCW 81.80.070 states that an applicant for a contract carrier permit must demonstrate his proposed service is consistent with public interest. But the term "consistent with public interest" has not been interpreted in this state. Interpreting similar language in a federal statute, in *New York Central Sec. Corp. v. United States*, 287 U.S. 12, 25, 77 L. Ed. 138, 53 S. Ct. 45, (1932) the United States Supreme Court said:

> [T]he term "public interest" as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, . . .

The evidence fully supports the superior court's findings of fact which adopt the examiner's findings. The examiner found that:

> 5. Applicant has sufficient experience, capital, equipment and knowledge of the law and Commission rules and regulations governing motor freight carriers to insure proper conduct of the proposed service.
> 6. The proposed service is new and has never been carried on by any common carrier.
> 7. Denial of the application would disrupt the shipper's

transportation procedure and cause possible loss and delay.

8. A grant of the requested authority will provide the shipper on an individual basis a prompt, coordinated, and economical transportation service particularly suited to its peculiar needs, and not available from common carriers.

The above findings of the examiner, supported by evidence, were upheld by the superior court. The findings support the conclusion that the respondent's services are consistent with the public interest.

Judgment of the trial court is affirmed.

GREEN, C.J., and MUNSON, J., concur.

Petition for rehearing denied April 9, 1973.

Review granted by Supreme Court June 7, 1973.