[No. 33487.   Department Two.   August 30, 1956.]

ELWOOD L. ACKERLUND *et al.*, *Appellants*, v. THE STATE EM-
PLOYMENT SECURITY DEPARTMENT *et al.*, *Respondents.*[1]

[1]Reported in 300 P. (2d) 1019.

*Zabel & Poth*, for appellants.

*The Attorney General, John D. Thomas, Jr.* and *Paul J. Murphy, Assistants, Bogle, Bogle & Gates*, and *J. Tyler Hull*, for respondents.

HILL, J.—This case involves appeals by a number of longshoremen from a judgment of the superior court for King county denying them benefits under our unemployment compensation act (Laws of 1945, chapter 35, p. 76, as amended [*cf.* RCW 50]) for unemployment occasioned by a work stoppage on the Seattle waterfront in 1952.

Under § 77 of the act [*cf.* RCW 50.20.090 prior to 1953 amendment], any claimant was disqualified for benefits for any week

". . . that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: . . ."

Appellants urge that the trial court erred, as did the commissioner of the department of employment security, in determining that the work stoppage which occasioned their unemployment was caused (1) by a labor dispute (2) at the establishment at which they were last employed.

QUESTION: Was there a labor dispute?

A group of foremen, some eighty in number, withdrew from the foremen's union of which they had been members and started an independent union. Picketing followed. The trial court, in its memorandum opinion, said, and we agree, that

". . . the record herein contains no evidence that any longshoreman involved in these proceedings at any time either crossed picket lines to report to work, or worked behind such picket lines once established. There are a number of examples in the record of individuals who refused to

cross picket lines, and other cases where workers, already at work behind picket lines, left their job when the lines were established."

Appellants' thesis is that foremen are part of management, and that the controversy between the two unions made up of foremen was therefore not a labor dispute. This is unrealistic and without foundation in fact or law. Appellants rely upon the provision of the labor management relations act of 1947 (Taft-Hartley), 29 U. S. C. (1952 ed.) § 164(a), which provides that:

"No employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining."

From this they seek to draw the conclusion—with which we do not agree—that a jurisdictional dispute between two unions made up of foremen is not a labor dispute within the purview of the state unemployment compensation act.

The labor management relations act relates in part to the regulation of collective bargaining and the conditions under which collective bargaining shall be required; the state unemployment compensation act relates to insurance against the economic losses caused by unemployment. The two statutes, having been enacted to achieve different and unrelated objectives, have no relationship to each other. Further, the state unemployment compensation act was enacted in 1945, the Federal labor management relations act in 1947. We cannot agree that anyone can determine, by virtue of a congressional enactment in 1947, what the Washington legislature intended in 1945.

Most courts in which the issue of whether definitions incorporated in the national labor relations act (predecessor to the labor management relations act) should be applied to state unemployment compensation acts, even though the state law may have been enacted subsequent to the Federal act, have ruled against the contention made by the appellants in this case. *Knox Consolidated Coal Corp. v. Review Board* (1942), 43 N. E. (2d) (Ind. App.) 1019 (reversed on other grounds), *Walter Bledsoe Coal Co. v. Review Board*

(1943), 221 Ind. 16, 46 N. E. (2d) 477); *Department of Industrial Relations v. Drummond* (1941), 30 Ala. App. 78, 1 So. (2d) 395.

In his memorandum decision, the trial judge, the Honorable Harold A. Seering (since deceased), very adequately answered the "no labor dispute" contention when he said:

"The quoted section of the Taft-Hartley Act merely states that an employer shall not be compelled to bargain with supervisors. Here there is in existence an agreement between the employers and the foremen's union which has been in existence for many years. There is nothing in the Federal law which prohibits such an agreement. Under the circumstances here where a number of members of the foremen's union seceded and went independent, the employers were still bound to observe the terms of their agreement with the union. The efforts of the independent group were directed to acquiring recognition in violation of that agreement. It seems clear that this constitutes a labor dispute."

In the case of *In re Polson Lbr. & Shingle Mills* (1943), 19 Wn. (2d) 467, 143 P. (2d) 316, we pointed out that the definition of "labor dispute" under our unemployment compensation act was left to the commissioner of the department of employment security in order that such definition might meet conditions as they arise. We there said (p. 479):

"It should be noted here that nowhere in the act is the term 'labor dispute' defined. We are of the opinion that the legislature deliberately failed to define that term, for the reason that it realized that any attempt to define that term might result in a definition which would not meet conditions arising in the future. The legislature therefore left this question to be determined by the commissioner."

We are satisfied that the trial court was amply justified in concluding that the commissioner of the department of employment security "has acted within his power and has correctly construed the law" (Laws of 1945, chapter 35, § 131, p. 145 [cf. RCW 50.32.150]) in determining that there was a labor dispute and that the appellants belonged to a grade or class of workmen who participated therein by their voluntary refusal to go through the picket lines. Indeed, it

seems to us that it would be difficult, entirely apart from the determination of the commissioner and the rule laid down in the *Polson* case, *supra*, for any court to arrive at any other conclusion.

QUESTION: Was the labor dispute at the establishment at which the longshoremen were last employed?

■ The trial court's findings of fact Nos. 4 and 5 make clear the factual situation which was the basis for its conclusion, with which we agree, that the Seattle waterfront is a single establishment within the meaning of the unemployment compensation act:

"IV. Waterfront Employers of Washington is a non-profit employer's association composed of a number of steamship, stevedoring and terminal-operating companies in the State of Washington. Waterfront Employers of Washington handles for employers of longshoremen and dock workers the accounting, maintenance of payrolls, reporting of wages for contributions and other tax purposes, and maintains reserve accounts to effectuate the various provisions of the collective bargaining agreements covering longshoremen and dock workers relative to welfare, pensions and vacations. Waterfront Employers of Washington maintains central pay offices where nearly all longshoremen and dock workers working on the Seattle waterfront receive their consolidated weekly pay, although Waterfront Employers of Washington does not directly hire or employ any longshoremen or dock workers.

"V. Longshoremen and dock workers employed on the Seattle waterfront are dispatched from a central hiring hall jointly maintained by Pacific Maritime Association and ILWU. By virtue of existing collective bargaining agreements and hiring arrangements, employment and work opportunities of longshoremen and dock workers are not confined to a single employer on the Seattle waterfront. A system of rotational hiring exists based upon work opportunities in the entire port, and an individual worker may render services for several companies within a week. The purpose of rotational hiring is to give each worker a proportionate share of work opportunities available at all of the companies in the port. Consequently, all longshoremen and dock workers here involved have an enforceable right to first call on the work of all the companies in the port. This hiring arrangement assures each longshoreman and dock worker of

his proportionate share of work on the Seattle waterfront. If work is to be performed by longshoremen or dock workers on the Seattle waterfront falling within the scope of their collective bargaining agreements, the longshoremen and dock workers covered by these collective bargaining agreements have a legally enforceable right to perform such work. The Commissioner of the Employment Security Department found that all of the companies at which longshoremen and dock workers are employed on the Seattle waterfront under these collective bargaining agreements comprise a single establishment from the standpoint of employment."

The facts in this case are almost identical with those presented in *Matson Terminals v. California Employment Comm.* (1944), 24 Cal. (2d) 695, 151 P. (2d) 202, except that the waterfront was tied up by picket lines put out by the checkers rather than by the foremen, as in the present case. As to the longshoremen who were not actually at work when the strike began, it was urged in the *Matson* case that they were unemployed at that time. The California supreme court answered that contention in these words (p. 706):

"His [the registered longshoreman's] right to work is more secure than that of the ordinary employee, for he has a legally enforceable right whereby the group is entitled to first call on the work and each longshoreman is entitled to his share. Although he does not work regularly for the same employer at the same place of business, a procedure forbidden by the contract between the longshoremen's union and the employers' association, and the intervals between work assignments may at times be longer than those for a factory worker, because of the intermittent nature of longshore work, he works under an employment arrangement that assures him his proportionate share of the work on the San Francisco waterfront."

It then drew the conclusion that the entire San Francisco waterfront was one "establishment," saying (p. 707):

"The longshoremen's work and its locale are governed by contract. One of the objects of the contract was the abolition of the system that normally prevailed when some longshoremen worked regularly for one employer while others had only occasional work. Under the contract all registered longshoremen are assigned through the hiring hall to all the work of all the employers. As applied to these facts the term

'establishment' as used in section 56 (a) means the place of employment, namely, the various docks covered by the contract, where the longshoremen customarily work. This was the area covered by the ship clerks' strike."

Appellants agree that the *Matson* case cannot be distinguished from the present case on the facts, but they urge that our statute contains a proviso, not contained in the California act, which requires a different result. That proviso is as follows:

" . . . *Provided*, That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subdivision, be deemed to be a separate factory, establishment, or other premises." Laws of 1945, chapter 35, § 77, subd. (b), p. 116 [*cf.* RCW 50.20.090 prior to 1953 amendment].

This proviso has no application to the situation with which we are here concerned. It relates only to separate branches of the same enterprise. The facts in *Ford Motor Co. v. Unemployment Compensation Comm.* (1951), 191 Va. 812, 63 S. E. (2d) 28, on which the appellants here rely, fit that limited pattern, as do the facts in the other cases in which the proviso has been decisive. Our own case of *Wicklund v. Commissioner of Unemployment Compensation* (1943), 18 Wn. (2d) 206, 138 P. (2d) 876, 148 A. L. R. 1298, is illustrative of the situation the proviso was intended to cover. It involved the trainmen who handled the trains on a railroad operated by a logging company to haul its logs. A strike of the loggers had caused unemployment of the trainmen, and the latter had applied for unemployment compensation. We there approved the conclusion of the trial court that (p. 221)

" . . . the claimants were not participating in nor financing nor, within the contemplation of the statute, directly interested in the labor dispute which caused the stoppage of work; that in their work as trainmen the claimants were operating a special branch of work which was conducted as a separate business or department, and that the claimants did not belong to a grade or class of workers of

which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurred, any of whom were participating in or financing or directly interested in the dispute";

and held that the trainmen were in a separate department from the striking loggers and hence were entitled to unemployment compensation even though their unemployment was caused by the strike of the loggers.

Longshoring done for employer "A" is not a separate branch of work from longshoring done for employer "B". Each longshoreman had a legally enforceable right to work at any dock on the Seattle waterfront at which work was available. As far as each longshoreman was concerned, the waterfront was one establishment, neither a group of separate establishments nor separate departments of the same establishment.

The evidence clearly establishes that longshoremen (a "grade or class of workers" to which all the claimants belonged) had voluntarily refused to cross the picket lines or to work behind them. They thereby participated in the labor dispute.

The judgment of the superior court is affirmed.

MALLERY, OTT, WEAVER, and ROSELLINI, JJ., concur.