[No. 44190.   En Banc.   April 14, 1977.]

EMPLOYEES OF PACIFIC MARITIME ASSOCIATION, ET AL, *Respondents,* v. R. W. HUTT, ET AL, *Appellants.*

EMPLOYEES OF PACIFIC MARITIME ASSOCIATION, ET AL, *Appellants,* v. R. W. HUTT, ET AL, *Respondents.*

*Slade Gorton, Attorney General, Joseph M. Littlemore, Senior Assistant,* and *Michael E. Tardif, Assistant,* for appellant State.

*Bogle & Gates* and *Dustin C. McCreary,* for appellant Pacific Maritime Association.

*Robert D. Duggan, Levinson, Friedman, Vhugen, Duggan & Bland, Monte Hester, Binns, Petrich, Mason, Hester & Robson, M. Lee Price,* and *Hafer, Cassidy & Price,* for respondents.

WRIGHT, C.J.—This appeal involves unemployment claims of individuals who had some employment in the Washington longshore industry during 1971–72. The primary issue is whether these claimants are disqualified from receiving benefits because they fail to fit within the exception to RCW 50.20.090.[1] The facts are complex and need to be stated in detail.

---

[1] RCW 50.20.090 provides:

"An individual shall be disqualified for benefits for any week with respect to which the commissioner finds that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: *Provided,* That this section shall not apply if it is shown to the satisfaction of the commissioner that

"(1) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: *Provided,* That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subdivision, be deemed to be a separate factory, establishment, or other premises."

The International Longshoremen's and Warehousemen's Union (ILWU) has a number of locals in the state of Washington. Generally, there are separate locals for longshoremen, clerks (checkers), and foremen.

The Pacific Maritime Association (PMA) is an employers' association composed of steamship, stevedoring and terminal companies operating at ports in the state of Washington. With the exception of the employees of the Port of Grays Harbor, all workers involved in this appeal are governed as to their wages, hours and working conditions by contracts entered into as a result of collective bargaining between PMA and ILWU. The longshoremen are governed by one contract, the clerks by another, and the foremen by a third. The first two contracts became part of what is known as the ILWU–PMA Pacific Coast Longshore and Clerks' Agreement. The foremen's contract is usually negotiated after there is a final settlement of the longshoremen's and clerks' agreement. The foremen's contract incorporates by reference certain provisions in the longshoremen's and clerks' contracts—particularly pension and welfare benefits.

Longshoremen and clerks are divided into three categories: (1) Class A workers. These persons are fully registered under PMA–ILWU agreements, are dues–paying members of the ILWU, and have primary preference for available work. (2) Class B workers. These persons are "limited registered" under PMA–ILWU agreements, are not ILWU members, and have a secondary preference for available work. (3) Casual workers. These persons are non–ILWU members who have no work preference. Finally, there are foremen. These persons are ILWU members, and their primary function is the supervision of longshore gang work.

In addition to the above classifications, there are several subclassifications. Each port has a dispatcher who assigns workers to the available jobs. The dispatchers are the joint employees of the PMA and ILWU, each paying half their wages. Every dispatcher is a class A worker and a member of the ILWU. Some of the clerks involved in this dispute

are classified as "supercargoes." While the record is unclear, these persons were probably treated herein as class A workers for all purposes.

Some claimants involved in this appeal are "regular steady" employees of the Port of Grays Harbor (Port). The Port negotiates a separate contract with the ILWU local in Aberdeen, and it is not dependent on the negotiations between PMA and ILWU except as to pension and welfare benefits. The "regular steady" employees of the Port are divided into both class A and B workers, and work primarily in the handling of cargo on the docks and on shore. There was no strike against the Port, and these employees continued to work until there was no more work available.

On July 1, 1971, the longshoremen's, clerks' and foremen's contracts with the PMA all expired. Prior to this date, a majority of class A longshoremen and clerks authorized a strike. None of the class B registered longshoremen or clerks had any voice or vote as to the strike. The foremen's locals did not strike partly because of the contract negotiation process described above.

The strike itself lasted from July 1 to October 9, 1971, and from January 17 to February 21, 1972. During these periods, workers were dispatched to handle military cargo. There is no evidence that any of these dispatched workers refused to cross a picket line. In other instances, work was performed behind picket lines by agreement.

The labor dispute was settled on or about February 21, 1972. Pursuant to section 209(b) of the National Labor Relations Act (29 U.S.C. § 179(b)), as amended, all employees registered under the ILWU–PMA Pacific Coast Longshore and Clerks' Agreement as class A or class B workers who were employed, ill or on a leave of absence during the payroll quarter ending June 16, 1971, were entitled to vote on whether to accept the final offer of the PMA.

Claimants applied to the Department of Employment Security for unemployment compensation at various times during the 1971–72 ILWU strike. The department allowed

benefits to some claimants and denied benefits to others, depending on the employment status of the individual at the beginning of the strike.

Five separate appeals were filed with the appeals tribunal of the Department of Employment Security. The appeals tribunal denied benefits to class A workers and dispatchers, but granted benefits to class B and casual workers, and foremen. All parties appealed to the commissioner. All appeals were consolidated. On January 12, and August 23, 1973, the commissioner issued decisions affirming the appeals tribunal regarding class A and casual workers and dispatchers. The commissioner reversed the appeals tribunal regarding class B workers and foremen. Appeals were taken to superior courts in various counties pursuant to RCW 50.32.120 and 34.04.130. Most of the superior court actions were consolidated in Thurston County. The appeal in Grays Harbor County was decided separately.

In the Thurston County consolidated appeal, the trial court affirmed the commissioner as to class A and casual workers and dispatchers, but reversed the commissioner as to class B workers and foremen. Appellants (the commissioner and the PMA) appealed the trial court's reversal of the commissioner as to class B workers and foremen to the Court of Appeals. That court certified the entire matter to this court.

In the Grays Harbor County appeal, the Superior Court sustained the commissioner's ruling that all class A and B Port employees, dispatcher Max Vekich, and class B workers of the ILWU local in Aberdeen were disqualified from receiving unemployment benefits because of the strike. All of these claimants appealed to the Court of Appeals. The appeals from Thurston County and from Grays Harbor County were consolidated.

Before we reach the principal issues, we first hold that this case is properly within the scope of judicial review under the "clearly erroneous" test of RCW 34.04.130(6)(e). *Swift v. Island County*, 87 Wn.2d 348, 552 P.2d 175 (1976); *Schuffenhauer v. Department of Employment Security*, 86

Wn.2d 233, 543 P.2d 343 (1975); *Ancheta v. Daly,* 77 Wn.2d 255, 461 P.2d 531 (1969).

RCW 50.20.090 disqualifies an individual from receiving unemployment benefits if the commissioner finds that claimant's "unemployment is due to a stoppage of work [caused by] a labor dispute at the factory, establishment, or other premises at which [claimant] is or was last employed." The disqualification section does not apply, however, if the claimant (1) "is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work;" and (2) "he does not belong to a grade or class or workers" any of whom are engaged in the above described activities. The first issue involved here is whether the class B longshoremen and clerks and all foremen are "directly interested" in the labor dispute so that they fail to requalify under RCW 50.20.090(1). *Wicklund v. Commissioner of Unemployment Compensation,* 18 Wn.2d 206, 138 P.2d 876, 148 A.L.R. 1298 (1943) and *Ancheta v. Daly, supra,* are the two principal cases construing the phrase "directly interested" in RCW 50.20.090(1). *Wicklund* was a consolidated appeal. In the first fact situation involved in that case 34 employees of the Polson Logging Company and the Ozette Railway Company claimed unemployment benefits during a strike of these companies by the Sawmill and Timber Workers' Union of the International Woodworkers of America. The sole purpose of the strike was to force those 34 employees, who belonged to a different union, to join the Sawmill and Timber Workers' Union. The employees finally decided to join, and the strike ended. In granting benefits for the claimants, we said the policy of the Unemployment Compensation Act requires that it be liberally construed to protect workers who are involuntarily unemployed. We then adopted the rationale of the New Jersey Supreme Court in *Kieckhefer Container Co. v. Unemployment Compensation Comm'n,* 125 N.J.L. 52, 53–54, 13 A.2d 646 (1940) when construing the phrase "directly interested":

The argument is that inasmuch as every employe was interested in the improvement of his working conditions, rate of pay and other matters related to his employment, therefore, each employe was "directly interested in the labor dispute which caused the stoppage of work." We conclude that this is a strained interpretation of the statute. The clear meaning of the language is to confine disqualification to those who are creating the dispute or participating therein in order to enforce their demands. To accept the prosecutor's construction would render every employe of a business, some of whose employes went on strike, ineligible for benefits, notwithstanding his non–participation therein and even though he might be opposed to the labor dispute and decline to have any part therein. The use of the words "directly interested in the labor dispute" clearly limits their application to those employes directly interested in its furtherance by participation and activity therein.

In 1969, this court was again called upon to decide what constitutes being directly interested in a labor dispute. In *Ancheta v. Daly, supra,* members of the Western Regional Machinists' Union struck several Seattle area shipyards. Members of other trade unions who had been employed at the shipyards were unemployed for most of the period during the machinists' strike. No members of the other trade unions crossed the machinists' picket lines during part of the strike. However, there was no evidence that there was any work available.

Members of these other trade unions applied for unemployment benefits during the machinists' strike. The commissioner ruled that the claimants were directly interested in the labor dispute, but the Superior Court reversed. In affirming the Superior Court, we discussed the *Wicklund* case in *Ancheta v. Daly, supra* at 264–65:

There, as here, more than one union was involved. There, as here, the strike by the one union was opposed by the other workers because it put them involuntarily out of work. There, as here, the concessions granted by the employer accrued to the benefit of all employees. We held in *Wicklund* that this was not enough to show direct interest. We stated at that time "The words 'directly

interested in the labor dispute' are clearly limited in their application to those employees directly interested in furtherance of the dispute by participation and activity therein." *Supra* at 214. Although there are some shortcomings in this definition of "directly interested," we believe that there was no direct interest by the claimants based upon the lack of participation by the claimants coupled with a recognition that the minimal penny an hour wage increase was in no real sense an economic benefit when compared with the long period during which the claimants were out of work. We are convinced that the claimants were within the relief provisions of RCW 50.20.090 and are entitled to unemployment benefits.

(Footnotes omitted.) In footnote 16 in *Ancheta,* we made the following observation:

We are not unaware of the criticism of *Wicklund* and *Kieckhefer Container Co. v. Unemployment Comp. Comm'm*, 125 N.J.L. 52, 13 A.2d 646 (1940) upon which it relies. See Bullitt, [*Unemployment Compensation in Labor Disputes,* 25 Wash. L. Rev. 50 (1950)] *supra* note 9 at 64; Note, *Eligibility For Unemployment Benefits of Persons Involuntarily Unemployed Because of Labor Disputes,* 49 Col. L. Rev. 550, 563 (1949). However, we believe that the test there applied, with the addition of an economic analysis to determine whether there was a real, significant and direct interest in the outcome of the dispute, reflects the intent of the legislature as well as diminishes the possibility of a "key man" strike being used to circumvent RCW 50.20.090.

In the present case appellants (the Commissioner of the Department of Employment Security and the PMA) contend that the class B workers and all foremen were directly interested in the labor dispute under the ruling of *Ancheta v. Daly, supra,* because their wages, fringe benefits, and working conditions were determined by the results of the negotiations between the striking class A workers and the PMA. Appellants also argue that the class B workers were directly interested because they were allowed to vote whether to accept the PMA's final order. In order for these claimants to be ineligible under *Ancheta,* however,

these persons must first have some direct input in the creation or maintenance of the dispute. Here, the claimants had only an indirect, albeit lucrative, interest. The B workers are not union members. Therefore, they had no say or vote in the decision to give the ILWU strike authorization. The foremen also had no direct interest in the labor dispute. They too did not vote to strike. Furthermore, the fact that class B workers were allowed to vote on the PMA's final offer is not controlling. The determination of who will be allowed to vote on a final offer is an administrative decision made by the National Labor Relations Board pursuant to an act of Congress. It is true that the class B workers receive substantially the same contract benefits as class A workers, but apparently this would occur even if there were no strike. The foremen's contracts were renegotiated in light of the new longshoremen's and clerks' contract. This renegotiation would occur whether the longshoremen and clerks reached a new agreement with the PMA after a strike or otherwise. Therefore, these claimants fit within the exception contained in RCW 50.20.090(1).

Appellants, however, contend that even if these claimants requalify under RCW 50.20.090(1), they are still ineligible for unemployment benefits under RCW 50.20.090(2) because they belong to the same grade or class of workers as the class A longshoremen and clerks. We have not developed a test for what constitutes the "same grade or class." In *In re St. Paul & Tacoma Lumber Co.,* 7 Wn.2d 580, 110 P.2d 877 (1941), this court implied that being a member of the same union and being engaged in the same type of work caused certain claimants to come within the grade or class provision under the facts of that case. We do not adopt the holding in that case as the basic test for RCW 50.20.090(2), however.

■ Courts in other jurisdictions with disqualification provisions in their unemployment compensation statutes similar to ours have taken three broad positions when deciding what elements determine whether a person comes within the "grade or class" disqualification. *See* Annot., 62

A.L.R.2d 314, 338–49 (1975). Each of these approaches is undesirable. Each has an element of unfairness because the criteria are artificial and rigid, and, therefore, may prove highly inequitable in a given fact situation. *See* Williams, *The Labor Dispute Disqualification—A Primer and Some Problems,* 8 Vand. L. Rev. 338, 358–60 (1955); Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 U. Chi. L. Rev. 294, 332–37 (1950). We adopt a more flexible approach as suggested in Shadur, *supra* at 334:

> All this is simple and plausible enough, requiring only application of a few basic principles. One is that "grade or class" should be determined in terms of the dispute itself, not in a vacuum of vague platitudes about what "ordinarily" constitutes a grade or class. Another is that "grade" and "class" were put in the alternative so as to narrow disqualification, not broaden it: "What the section means is that if the dispute relates only to men of a particular grade one must see whether the applicant belongs to that grade; if the dispute relates to a class of workers one must see whether the applicant belongs to that class." It follows that "grade" or "class" may in a given case be dependent upon similarity in type of work, occupation, conditions of work, methods or rates of pay, union membership or eligibility therefor, or the employees' age—but only when the dispute itself makes that factor significant.

(Footnotes omitted.) In this case, the most significant factor is that class A longshoremen and clerks authorized the strike. Class B longshoremen and clerks could not vote due to their nonunion status. The foremen did not vote either. None of these persons should be penalized for the actions of the class A workers. We therefore hold that class B longshoremen and clerks and all foremen are not disqualified under RCW 50.20.090(2).

The Superior Court for Grays Harbor County also denied benefits to all A and B class employees of the Port of Grays Harbor. These claimants argue, however, that there was

"no stoppage of work due to a labor dispute" at their "factory, establishment or other premises," and therefore RCW 50.20.090 does not apply.

    ■ In *Ackerlund v. Employment Security Dep't*, 49 Wn.2d 292, 300 P.2d 1019 (1956), we held that the Seattle waterfront was one establishment. In that case, a group of foremen withdrew from the foremen's union of which they had been members and formed another union. Picket lines were established and no longshoremen crossed them. In denying unemployment benefits to longshoremen–claimants, we said at page 299:

> Longshoring done for employer "A" is not a separate branch of work from longshoring done for employer "B". Each longshoreman had a legally enforceable right to work at any dock on the Seattle waterfront at which work was available. As far as each longshoreman was concerned, the waterfront was one establishment, neither a group of separate establishments nor separate departments of the same establishment.

In the present case, however, the employees of the Port do not work for anyone except the Port. As far as the Port employees are concerned, the waterfront is composed of separate establishments. We, therefore, hold that RCW 50.20.090 does not apply to the "regular steady" employees of the Port of Grays Harbor.

    The Grays Harbor County Superior Court also denied unemployment benefits to dispatcher Max Vekich of the Aberdeen hiring hall. He appeals. He is in a peculiar position. A dispatcher is the joint employee of the PMA and ILWU. His primary activities are dispatching and record keeping. During the course of a strike there is no dispatching or record keeping to be done, hence the dispatcher is unemployed. The policy of the Employment Security Act requires us to construe the act liberally to reduce economic insecurity. *Amburn v. Daly*, 81 Wn.2d 241, 501 P.2d 178 (1972); *In re Yakima Fruit Growers Ass'n*, 20 Wn.2d 202, 146 P.2d 800 (1944). Because of this policy, the dispatcher's

job activities, and his unique employment status, we believe he should receive unemployment benefits.

Finally, there is the matter of attorney's fees and costs. RCW 50.32.160 provides:

It shall be unlawful for any attorney engaged in any appeal to the courts on behalf of an individual involving the individual's application for initial determination, or claim for waiting period credit, or claim for benefits to charge or receive any fee therein in excess of a reasonable fee to be fixed by the superior court in respect to the services performed in connection with the appeal taken thereto and to be fixed by the supreme court or the court of appeals in the event of an appeal thereto, and if the decision of the commissioner shall be reversed or modified, such fee and the costs shall be payable out of the unemployment compensation administration fund. In the allowance of fees the court shall give consideration to the provisions of this title in respect to fees pertaining to proceedings involving an individual's application for initial determination, claim for waiting period credit, or claim for benefits. In other respects the practice in civil cases shall apply.

RCW 4.84.010, .030, and RCW 4.88.260 deal with costs. The Thurston County Superior Court awarded attorney's fees and costs to the successful claimants' attorneys because the court reversed the commissioner's decision. We affirm those awards. In addition, each of these attorneys has submitted a petition for attorney's fees and costs with supporting affidavits for this appeal. All appear reasonable and we hereby award the same.

The Grays Harbor County Superior Court did not reverse the commissioner. It approved but did not award an attorney's fee and costs. Because these claimants were successful on this appeal, however, we hereby award those amounts approved below. And counsel representing the claimants in the Grays Harbor County Superior Court action is further awarded attorney's fees and costs petitioned for due to the appeal to this court.

The judgment of the Thurston County Superior Court is affirmed and the judgment of the Grays Harbor County Superior Court is reversed.

ROSELLINI, HAMILTON, STAFFORD, UTTER, BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.

Petition for rehearing denied July 6, 1977.