[No. 2204–3.   Division Three.   March 21, 1978.]

*In the Matter of the* EMPLOYEES OF WILLAMETTE–
WESTERN CORPORATION.

EASTERN WASHINGTON AND NORTHERN IDAHO BUILDING AND
CONSTRUCTION TRADES COUNCIL, *Respondent,* v.
THE DEPARTMENT OF EMPLOYMENT SECURITY,
ET AL, *Appellants.*

*Slade Gorton, Attorney General,* and *Joseph M. Little-more* and *Michael E. Tardif, Assistants,* for appellants.

*Steven A. Crumb,* for respondent.

McINTURFF, J.—Willamette–Western Corporation and the State Employment Security Department appeal from a decision of the Superior Court which granted unemployment benefits to employees laid off during a strike at a construction site near Addy.

Those employees were carpenters, laborers, operating engineers and teamsters who were discharged by Western Pacific Piledriving, a division of Willamette–Western, because of a strike by the Northwest District Council of Ironworkers. The discharged employees filed claims for unemployment benefits with the Employment Security Department (Department) which initially allowed the claims. Willamette–Western appealed the decision, and the Department's appeal tribunal ruled the employees were disqualified from receiving benefits under RCW 50.20.090.[1] The commissioner of the Department affirmed the tribunal's decision, and the employees appealed to Superior Court, which reversed the commissioner's ruling and granted the benefits requested. We affirm.

---

[1]The statute provides:

"An individual shall be disqualified for benefits for any week with respect to which the commissioner finds that his *unemployment is due to a stoppage of work which exists because of a labor dispute* at the factory, establishment, or other premises at which he is or was last employed: *Provided,* That this section shall not apply if it is shown to the satisfaction of the commissioner that

"(1) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

The facts are not in serious dispute. The discharged employees, with the exception of the teamsters, are represented in negotiations with the Associated General Contractors (AGC), of which Willamette–Western is a member, by the Eastern Washington and Northern Idaho Building and Construction Trades Council. Each of the craft unions and the teamsters had individual labor agreements with the AGC. The ironworkers negotiated through their district council in Seattle.

On July 9, 1974, when contract negotiations between the ironworkers and the AGC broke down, ironworkers left the jobsite. They did not picket the construction site, but because their absence so adversely affected the project, the employer reduced its construction crew from 108 on July 10 to 30 on July 11. The dispute lasted 8 weeks. It is for at least that time period the discharged employees sought unemployment benefits.

In denying their claims, the Department's appeal tribunal essentially held that because the nonstriking unions here historically benefit from any favorable wage or benefit agreements obtained by striking unions, the nonstriking union members were sufficiently interested in the labor dispute so as to disqualify them from receiving unemployment compensation.[2] The tribunal analyzed this case on

---

"(2) he does not belong to a *grade or class* of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: *Provided,* That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subdivision, be deemed to be a separate factory, establishment, or other premises." (Italics ours.)

[2]The Department's appeal tribunal found:

"5. The record is clear with respect to integration of the work. One craft's work depended upon anothers [*sic*] as illustrated by the fact that the appellant could not continue to operate after the Ironworkers went on strike. He immediately had to lay off all other crafts as it was impossible to pour concrete without the help of the Ironworkers who laid the steel. Thus the work was highly integrated and all employees, regardless of craft, were a member of one class of worker, a construction worker, and therefore are prima facie disqualified as a member of the class

the basis of *Cameron v. DeBoard,* 230 Ore. 411, 370 P.2d 709 (1962), which says an unemployed individual is an interested member of the same "grade or class" of striking workers—and thus statutorily disqualified from receiving benefits—if (1) there is an integration of the work of the claimant and the participants in the labor dispute, and (2) there is a community of interests between the claimant and the participants in the labor dispute which is more than a negligible interest but which may not be a full, direct interest.

Since this appeal was filed, our Supreme Court considered, for the first time, the "grade or class" disqualification in *Employees of Pac. Maritime Ass'n v. Hutt,* 88 Wn.2d 426, 562 P.2d 1264 (1977). The employees contend the Department's reliance on *Cameron v. DeBoard, supra,* is an error of law in light of *Hutt.* The Department and the employer suggest that *Hutt* and *Cameron* are consistent in their approach to determining the disqualification of workers of the same grade or class. They argue that the considerations deemed significant by both courts are identical.

---

contemplated in subsection (2) of the statute. In following the courts [*sic*] rationale, however, they may escape disqualification by showing a negligible or inconsequential interest in the outcome of the dispute.

"6. The facts in this case reveal a historical differential in wage and fringe benefits between the six basic crafts. If one craft obtains a benefit, for example dental care, one year, the others will go after it the following year. Settled agreements have been reopened and renegotiated on occasions. In the instant case, we find that after the Ironworkers agreement was ratified, two crafts, the Operating Engineers and the Teamsters, complained about their travel pay agreements after ratifying their contracts and the AGC agreed to reopen the agreements a year later on this particular point. In addition, it was brought out that the Carpenters who had ratified a three–year agreement prior to the settlements of the other crafts, felt they had not been treated fairly in comparison of the other crafts and talks are being held between this craft and the AGC to see what can be done about the inadequacies. *We feel that this reflects more than mere sympathy or passing interest on the part of one craft in the negotiations and contract settlements of another. It, in our estimation, constitutes the indirect interest contemplated by the court in the Cameron case supra and brings these claimants into the realm of grade or class contemplated by that court.* Therefore, they fail to meet the requalifying subsections of RCW 50.20.090 and are denied benefits for all of the weeks in question." (Italics ours.)

In analyzing a labor dispute and unemployment statute similar to those presented here, the Oregon court in *Cameron* considered nonstriking workers to be in the same grade or class of striking workers if their work was integrated. Integration of work became a prima facie disqualification from benefits, and the burden was on the claimants to establish they had no interest in the outcome of the dispute. The court then defined that indirect interest as a "community of interest." It said at pages 426–28:

> Whether or not such an indirect interest exists between a given claimant and the particular labor dispute depends upon all the facts. If a group of workmen stop work because of a grievance the group may have against their foreman, workmen not supervised by that foreman would not ordinarily have a sufficient community of interest with the first group to throw nonstrikers into the disqualified class . . . In such a case, membership in a common union would be significant only if union policy or some other factor supported an inference that concerted action actually involved a group larger than the ostensibly disputing group. On the other hand, if some of the unskilled workmen in a plant stop work in order to enforce a demand for higher wages, and management has traditionally maintained constant pay differentials between skilled and unskilled workers, then the skilled workers would have an indirect interest in the strike. The only difference between the economic interest of the strikers and that of the nonstrikers in such a case would be the fact that the resolution of the dispute would necessarily affect the strikers, whereas it would not necessarily affect the others. It is conceivable that management might choose to disregard the traditional pay differentials, at least for a time, with reference to the nonstrikers. Even here, however, the historical differential is a strong indication of the interest the skilled workers had in the dispute, and they may, in turn, strike to maintain the differential. In any event, such a state of affairs would indicate that the two groups shared a community of interest in the progress of each other's negotiations. This community of interest would be equally strong, both from an economic point of view and from the employer's point of view, whether the two groups of workmen were organized in the same union or in several

unions. Thus we see that the most important factor in the application of (3) (b) is the presence or absence of a community of interest between the workmen involved in a labor dispute and their nonstriking fellow workmen. This community of interest, as we have seen, may exist within a single union, or between several unions, depending upon the facts of each case.

The court then remanded the case for findings as to the

relationship, if any, between wage, working–condition and fringe–benefit improvements gained by the laborers, teamsters or operating engineers as the result of their respective strikes and similar gains flowing to the various nonstriking unions. . . . *If, . . . the work was integrated, and the claimants could not show that their gains, if any, were unrelated to those of the strikers, then these two factors would bring members of different unions into the same class for the purposes of the particular labor dispute.*

(Footnote omitted; italics ours.) *Cameron v. DeBoard, supra* at 429–30.

*Hutt* presented a unique factual situation. There some of the claimants were governed as to wages, hours and working conditions by contracts between the employer and the longshoremen's and warehousemen's union. Longshoremen were governed by one contract, clerks by another and foremen by a third. The foremen's contract generally was negotiated last and incorporated by reference certain provisions from the contracts of the clerks and longshoremen.

Longshoremen and clerks were divided into three categories: (1) Class A workers who were fully registered under the labor contracts, were dues–paying union members and had primary preference for available work; (2) Class B workers who were "limited registered" under the contracts, were not union members and had secondary work preference and (3) casual workers who were not union members and who had no work preference.

When the contracts expired on July 1, 1971, a majority of class A workers authorized a strike, but none of the class B workers had a voice or vote as to the strike. The foremen's locals did not strike. Under federal law both class A and

class B workers were entitled to vote on whether to accept the final offer of the employer.

On appeal, the Department first contended that class B workers and foremen were directly interested in the dispute. The court answered:

> In order for these claimants to be ineligible under *Ancheta* [*Ancheta v. Daly*, 77 Wn.2d 255, 461 P.2d 531 (1969)], however, these persons must first have some direct input in the creation or maintenance of the dispute. Here, the claimants had only an indirect, albeit lucrative, interest. The B workers are not union members. Therefore, they had no say or vote in the decision to give the ILWU strike authorization. The foremen also had no direct interest in the labor dispute. They too did not vote to strike. Furthermore, the fact that class B workers were allowed to vote on the PMA's final offer is not controlling. The determination of who will be allowed to vote on a final offer is an administrative decision made by the National Labor Relations Board pursuant to an act of Congress. *It is true that the class B workers receive substantially the same contract benefits as class A workers, but apparently this would occur even if there were no strike. The foremen's contracts were renegotiated in light of the new longshoremen's and clerks' contract. This renegotiation would occur whether the longshoremen and clerks reached a new agreement with the PMA after a strike or otherwise*. Therefore these claimants fit within the exception contained in RCW 50.20.090(1).

(Italics ours.) *Employees of Pac. Maritime Ass'n v. Hutt*, *supra* at 434–35.

The Department then urged that the class B claimants were of the same grade or class and met the other disqualifying factors of the statute. The court acknowledged that it had not previously developed a test for what constituted the same grade or class. Implications from *In re St. Paul & Tacoma Lumber Co.*, 7 Wn.2d 580, 110 P.2d 877 (1941), that being a member of the same union and being engaged in the same type of work caused certain claimants to come within the grade or class provision, were expressly rejected.

Recognizing divergent views concerning interpretations of the "same grade or class" disqualification, the court then said in adopting its test:

> Courts in other jurisdictions with disqualification provisions in their unemployment compensation statutes similar to ours have taken three broad positions when deciding what elements determine whether a person comes within the "grade or class" disqualification. *See* Annot., 62 A.L.R.2d 314, 338–49 (1975). Each of these approaches is undesirable. Each has an element of unfairness because the criteria are artificial and rigid, and, therefore, may prove highly inequitable in a given fact situation. *See* Williams, *The Labor Dispute Disqualification—A Primer and Some Problems,* 8 Vand. L. Rev. 338, 358–60 (1955); Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 U. Chi. L. Rev. 294, 332–37 (1950). We adopt a more flexible approach as suggested in Shadur, *supra* at 334:
>
> > *All this is simple and plausible enough, requiring only application of a few basic principles. One is that "grade or class" should be determined in terms of the dispute itself, not in a vacuum of vague platitudes* about what "ordinarily" constitutes a grade or class. *Another is that "grade" and "class" were put in the alternative so as to narrow disqualification, not broaden it:* "What the section means is that if the dispute relates only to men of a particular grade one must see whether the applicant belongs to that grade; if the dispute relates to a class of workers one must see whether the applicant belongs to that class." *It follows that "grade" or "class" may in a given case be dependent upon similarity in type of work, occupation, conditions of work, methods or rates of pay, union membership or eligibility therefor, or the employees' age—but only when the dispute itself makes that factor significant.*

(Footnotes omitted.) In this case, the most significant factor is that class A longshoremen and clerks authorized the strike. *Class B longshoremen and clerks could not vote due to their nonunion status. The foremen did not vote either. None of these persons should be penalized for the actions of the class A workers. We therefore hold*

*that class B longshoremen and clerks and all foremen are not disqualified under RCW 50.20.090(2).*

(Italics Ours.) *Employees of Pac. Maritime Ass'n v. Hutt, supra* at 435–36.

██ ██ We recognize that the scope of judicial review of administrative decisions is governed by RCW 34.04.130(6) which provides that we may affirm, reverse or remand the decision where the findings, inferences, conclusions or decisions are, among other things, affected by error of law, clearly erroneous or arbitrary and capricious. We also are aware that we are reviewing the decision of the administrative agency, *King County Water Dist. 54 v. King County Boundary Review Bd.*, 87 Wn.2d 536, 554 P.2d 1060 (1976), and that interpretations of statutes by agencies charged with their administration are not to be ignored or lightly regarded, *Regan v. School Dist. 25*, 44 Wash. 523, 87 P. 828 (1906).

We cannot find an administrative decision to be arbitrary and capricious unless we find willful and unreasoning action in disregard of facts and circumstances. *Northern Pac. Transp. Co. v. State Util. & Transp. Comm'n*, 69 Wn.2d 472, 418 P.2d 735 (1966). And, we cannot consider such a decision to be clearly erroneous unless we have a definite and firm conviction that a mistake has been committed. *Ancheta v. Daly*, 77 Wn.2d 255, 461 P.2d 531 (1969); *Farm Supply Distribs., Inc. v. State Util. & Transp. Comm'n*, 83 Wn.2d 446, 448, 518 P.2d 1237 (1974).

██ In light of *Employees of Pac. Maritime Ass'n v. Hutt, supra,* we are convinced the Department erred in not granting unemployment benefits to the nonstriking union workers who were laid off because of the ironworkers' walkout. As earlier emphasized, the nonunion workers in *Hutt* had an "indirect, albeit lucrative interest" in the outcome of the strike by union members. They would receive substantially the same contract benefits as the striking workers

whether or not there was a strike. The same historical wage and benefit differential was found to exist here, and here, as in *Hutt,* the laid–off employees did not have a vote as to whether members of the striking union should strike. Because of the similarities between the striking and non-striking employees here and in *Hutt,* we are convinced the Department erred as a matter of law in denying the claims of the discharged employees under RCW 50.20.090.

Judgment of the Superior Court is affirmed. Additionally, based upon RCW 50.32.160, and the affidavit and application for attorney's fees, we grant the respondents $2,250 as reasonable attorney's fees on this appeal.

Munson, C.J., and Green, J., concur.

Reconsideration denied April 20, 1978.