[Nos. 2999–2; 3036–2.   Division Two.   April 19, 1979.]

KENITH D. AARHAUS, ET AL, *Appellants,* v. THE
DEPARTMENT OF EMPLOYMENT SECURITY,
*Respondent.*

EMPLOYEES OF ST. REGIS KRAFT PLANT, *Appellant,*
v. ERNEST F. LA PALM, *Respondent.*

*Griffin & Enslow, Fred G. Enslow, Hafer, Cassidy & Price,* and *M. L. Price,* for appellants.

*Slade Gorton, Attorney General,* and *Michael Tardif, Assistant,* for respondents.

PETRIE, J.—Various maintenance employees of the St. Regis Paper Company's Kraft Mill in Tacoma, Washington, filed appeals from a judgment of the Superior Court for Pierce County affirming a decision of the Commissioner of Employment Security which had denied them unemployment compensation benefits. We affirm the judgment as modified herein.

The Commissioner's "Findings of Fact" have not been challenged in this court nor in the trial court. We accept them as verities.

The issue, simply stated, is whether the employees were subject to disqualification from receiving benefits by reason of the provisions of RCW 50.20.090.[1] The hourly employees did not work at the mill from July 11 to September 22, 1975, when there was a stoppage of work at the mill which existed because of a labor dispute between the "production" employees and the company. Depending upon the extent of other employment they obtained, the "maintenance" employees filed claims for benefits ranging from 1

---

[1]RCW 50.20.090 provides:

"An individual shall be disqualified for benefits for any week with respect to which the commissioner finds that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: *Provided,* That this section shall not apply if it is shown to the satisfaction of the commissioner that

"(1) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"(2) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute: *Provided,* That if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subdivision, be deemed to be a separate factory, establishment, or other premises."

week to 10 weeks. The appealing "maintenance" workers contend they were not "participating in," were not "directly interested in" the labor dispute, and did not "belong to a grade or class of workers" who were participating in and directly interested in the labor dispute. The Commissioner concluded otherwise, and thus denied benefits on all three statutory grounds.

We note, preliminarily, that the Commissioner reached his conclusions as to the issues of "directly interested in" and "grade or class" by applying a standard of law set forth in *Cameron v. DeBoard,* 230 Ore. 411, 370 P.2d 709 (1962). Subsequent to the Commissioner's decision, that standard has been impliedly and expressly rejected in this jurisdiction. *Employees of Pac. Maritime Ass'n v. Hutt,* 88 Wn.2d 426, 562 P.2d 1264 (1977) (impliedly) and *In re Employees of Willamette–Western Corp.,* 19 Wn. App. 562, 576 P.2d 442 (1978) (expressly).

Applying the appropriate standard of law embraced in *P.M.A.* and in *Willamette,* we conclude that the Commissioner's ruling as to these two issues was clearly erroneous within the meaning of RCW 34.04.130(6)(e).

Notwithstanding this conclusion, the appellants are not entitled to benefits unless the Commissioner also erroneously concluded that they were "participating in" the labor dispute. The Commissioner specifically found that "no maintenance employees served on a striking union picket line or provided any financial support for the striking union." All parties have accepted that finding as correct. Thus, we do not reexamine that type of "participation." Furthermore, the record clearly establishes that no maintenance worker crossed the picket line during the strike. The real issue in this appeal, therefore, revolves around the question of the availability of work at the mill to the non-striking maintenance employees.

█ The rule in this jurisdiction is:

If there is no work available and the employee has been given every indication that he is laid off, he is not further required to cross a picket line in order to show his lack of

participation in the labor dispute. Instead of looking at such symbolic but somewhat meaningless acts, we look at the realities of the situation.

(Footnote omitted.) *Ancheta v. Daly,* 77 Wn.2d 255, 263, 461 P.2d 531 (1969).

What were the "realities of the situation" which existed on or about July 10, 1975, immediately preceding the strike called by the production workers who were represented by the United Paperworkers International Union (UPIU)? The record contains relatively few factual disputes.

The labor agreement between St. Regis and UPIU and the separately negotiated labor agreement between St. Regis and Pierce County Building and Construction Trades Council (representing the several crafts involved in maintenance work at the mill) had both expired on May 31, 1975. After giving 48 hours' notice, UPIU called a strike effective at 12:01 a.m. July 11, 1975. The company immediately made plans to shut down production facilities at the mill. Shutdown procedures were completed 4 hours before the strike deadline, utilizing both production and maintenance employees working on their regular schedules.

In a last ditch effort to avoid the strike, the President of the Pierce County Central Labor Council, together with the President and the Secretary of the Pierce County Building and Construction Trades Council, attempted to mediate the dispute between UPIU and St. Regis. Mediation efforts proved unsuccessful, but the three mediators were "in a sort of semi-mediation session" in the afternoon of July 10 with the management negotiating committee. The unrebutted testimony of the resident manager of the mill described a conversation which took place during a lull in mediations:

> Q. Did you have occasion in talking to these gentlemen to discuss this subject of work for the maintenance unit?
>
> A. In not making a direct mandatory statement of any kind, we indicated to those people there was work for their people if they would come to work—in the maintenance field. And again, we pointed this out on the basis that in our prior economic shutdowns, why,

we did have some constraints on not working the whole crew. We did take shutdown type repair jobs and do them during the economic shutdown when everybody else was laid off. In a plant that size, we'd always have something that's awaiting a shutdown, either in the department or the whole mill, in order to repair, and we had work of that nature, plus we had a backlog of which has been indicated by the previous witness, a backlog of work that's always maintained.

Q. Did Mr. Peterson or Henderson or Hupp [the mediators] make any response to this?

A. Not particularly. The feeling—again it was only my feeling, they didn't address themselves to it—during the course of the afternoon, apparently a problem with one of the maintenance shop stewards in our plant was calling for advice on what to do because certain members of his particular craft were saying they were going to come to work the next morning, and it was my distinct impression that this was not desirable from the labor union's standpoint. They didn't want the picket line being crossed.

Q. Were there any subsequent discussions with any of these gentlemen regarding the subject matter?

A. No, sir.

Meanwhile, back at the mill, rumors were flying; and several slightly inconsistent pictures as to availability of work are portrayed in the record. Several salaried supervisors told some of the maintenance workers there would be no work for them the next day. The chairman of the union standing committee, Al Gratzer, for reasons not apparent from the record, was not called to testify. Nevertheless, two conflicting statements are attributed to him. The company's assistant personnel manager testified as to a conversation he had with Mr. Gratzer at 3:15 p.m.: "Mr. Gratzer said if he was not told definitely that there was no work available, he would lead his people across the picket line." On the other hand, one of the maintenance employees, a machinist, testified: "The head of the Standing Committee told me the personnel said there was no scheduled work the following day." Despite the fact that several (representatively selected) maintenance employees testified that their

supervisors indicated to them that there would be no work for them on Friday, July 11, the Employment Security Department Appeals Examiner who presided at the hearings found, and the Commissioner adopted the finding, that:

> St. Regis at no time posted notices that no work would be available after the strike commenced. No employees, with the possible exception of 6 boilerhouse employees who were working the swing shift on July 10, 1975, were informed that they were laid off until the strike was settled.

The appeals tribunal concluded that the maintenance employees did not "participate in" the production workers' strike, but on appeal by the company, the Commissioner concluded:

> There was work available to the maintenance employees at the time the strike took effect, this work was not performed by them during the period of the strike, and we feel it is unnecessary to speculate whether they would have been totally or partially unemployed for the period of the strike. It is therefore our conclusion that the maintenance employees, by reason of their failure to cross the picket line of the production employees, have "participated" in the strike within *In re St. Paul and Tacoma Lumber Co.*, 7 Wn.2d 580, 110 P.2d 877 [1941].

In the face of this inconclusive record, we are required to "look at the realities of the situation" and ascertain whether or not, pursuant to RCW 34.04.130(6)(e), the Commissioner's decision is "'clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order . . .'" *Ancheta v. Daly, supra* at 258–59.

█ In reaching his conclusion that the maintenance employees participated in the strike, the Commissioner expressly stated that several company exhibits entitled "Craft Backlog Report" for months of May, June, July, September and October 1975 "established to our satisfaction that there was a substantial amount of work available for each of the maintenance crafts at the time of the

strike." An important distinction in semantics is necessary in view of the Commissioner's declaration. The craft backlog reports merely indicate that there was maintenance work to be performed *whenever the company chose to have it performed*; the reports do not establish that there was "work available" to the nonstriking employees in the sense in which that term is used in *Ancheta v. Daly, supra.*

In order to capture the "availability of work" in the *Ancheta* sense, we must focus on the intent of the employer, expressed or implied, as manifested from the record as a whole, as to whether maintenance employees would indeed have been provided employment if they had chosen to come to work after the shutdown of the mill. That "intent" is a fact peculiarly within the knowledge and control of the employer. Although the nonworking employee has the burden of establishing his right to unemployment compensation benefits, and this burden never shifts during the course of the proceedings, *In re Townsend,* 54 Wn.2d 532, 341 P.2d 877 (1959) nevertheless, the employer has the burden to come forward with facts which are peculiarly within its knowledge and control. *See Michigan Tool Co. v. Michigan Employment Security Comm'n,* 346 Mich. 673, 78 N.W.2d 571 (1956).

The record as a whole is, perhaps understandably, ambiguous on the vital issue of "availability of work" in the *Ancheta* sense. Nevertheless, in seeking the "realities of the situation," we are impressed with the resident manager's unchallenged summation of his conversation with the two principal officers of the recognized bargaining agent of the maintenance employees in the afternoon preceding the strike, and the failure of the bargaining agent to respond to the company's express offer.

We conclude that the realities are:

1. A legitimate, if somewhat informal, offer of continuing employment was made by responsible company officials to responsible officials of the recognized bargaining agent for the maintenance employees;

2. The resident manager's "impression", that it was not desirable from the union's standpoint to have the maintenance employees cross the picket line, was probably a correct analysis of the situation;

3. On the other hand, the company probably expected and anticipated the lack of union response—and, indeed, was possibly relieved by the lack of response to the offer;

4. The only "maintenance" work actually performed during the strike was performed by supervisory employees, sufficient merely to avoid safety and security hazards; and

5. The company had no intention whatsoever to reactivate the steam plant during the strike, and the offer of continued employment did not extend to those employees whose principal duties included operation of the steam plant. (Indeed, the craft backlog reports did not even purport to contemplate them.)

Accordingly, we conclude that, except for those stationary engineers who were employed principally to keep the steam plant operating, the Commissioner's decision that the maintenance employees "participated in" the strike was not "clearly erroneous." Only those stationary engineers specified above requalified for unemployment compensation benefits within the contemplation of RCW 50.20.090.

Judgment affirmed as modified herein.

REED, A.C.J., and SOULE, J., concur.